COMMONWEALTH vs. GARY KING.

Plymouth. February 14, 1984. — March 8, 1984.

Present: GREANEY, CUTTER, & WARNER, JJ.

*Delinquent Child. Jurisdiction,* Delinquent child, Transfer hearing. *Practice,
  Criminal,* Transfer hearing. *Evidence,* Admissions and confessions. *Con-
  stitutional Law,* Admissions and confessions.

A District Court judge's findings to the effect that a defendant was not amenable
    to rehabilitation as a juvenile and should be tried as an adult for rape and other
    serious crimes were supported by the evidence at a transfer hearing. [603-605]
No error appeared in a judge's denial of a sixteen year old defendant's motion to
    suppress statements made by the defendant to police that "I did it. I did it. I
    raped that girl and I need help," where the evidence warranted the judge's
    findings that the statements were volunteered by the defendant rather than the
    product of any police interrogation. [605-609]
Evidence at a hearing on a motion to suppress statements made by a sixteen year
    old defendant warranted a finding that, although the defendant did not have an
    opportunity to consult with his mother before being questioned by police, the
    defendant had voluntarily, knowingly and intelligently waived his Miranda
    rights. [609-611]

INDICTMENTS found and returned in the Superior Court Depart-
ment on November 26, 1980.

Pretrial motions to dismiss and to suppress evidence were heard
by *Wagner, J.,* and the cases were tried before *Dwyer, J.*

*Susan G. Kauffman* for the defendant.

*Robert S. Sinsheimer,* Assistant District Attorney, for the Com-
monwealth.

GREANEY, J. In the early morning hours of May 18, 1980, a
young woman was brutally assaulted and raped while walking
home from a nightclub in Hull. The victim, who had a good op-
portunity to observe her assailant, subsequently examined between
200 and 300 photographs shown to her by the police and positively
identified the defendant, a sixteen year old juvenile, as the individ-

ual who had attacked her. The Hull police obtained a warrant and arrested the defendant for the crimes. After a hearing in a juvenile session of a District Court, the defendant's case was transferred to the Superior Court, where he was indicted for rape, the commission of unnatural acts, and assault and battery. A jury found him guilty of all three offenses, and sentences were imposed.[1] On appeal, the defendant alleges error concerning (1) the decision to transfer his case from juvenile proceedings to adult proceedings; and (2) the denial of his motion to suppress certain incriminating statements made to the Hull police. We affirm the convictions before us.

1. *The transfer decision.* In deciding that the defendant should be treated as an adult through transfer of his case to the Superior Court, the District Court judge reached the following conclusions. " [The defendant] is before the court charged with a very vicious and brutal rape of a young woman; a woman who was continuously beaten and kept in a state of absolute terror for nearly two hours in an isolated area of Hull. [The defendant] has been involved with this court since he was 11½ and, despite extensive efforts by the court's juvenile probation staff, the Office of Social Services to which he was committed as a truant, Longview Farms and the Reach School, he has failed to meet any of the goals set for him *solely* due to his own lack of cooperation. He has had CORE evaluations, psychiatric counseling, resident and nonresident school placements, all for naught. When asked if he would do it again (rape a woman) if he were drunk, he admitted that he probably would and volunteered that he might even kill someone. Hence, there is a real danger to the public if [the defendant] were released. At age 17, 3 months there is less than a year as a practical matter before [the defendant] would be released from the juvenile system. Indications are that if retained in the juvenile system it would probably be a month or more before his trial could be completed and if committed to DYS it could take up to nine months before he could be placed in a secure setting. The minimum residen-

[1]The defendant received concurrent State prison sentences on the rape and unnatural acts convictions. The assault and battery conviction was placed on file with the defendant's consent and is, therefore, not before us. *Commonwealth* v. *Hoffer,* 375 Mass. 369, 370 n.1 (1978).

tial plan proposed for [the defendant] is four additional months. It should be added that at [the defendant's] age there is absolutely no guarantee that he would be placed at Westborough or any other secure DYS setting. Others have been rejected. The overriding factor, however, is that [the defendant] has never cooperated with any programs previously set up for him and there is absolutely no reason to believe that he would cooperate now. He remains hostile and rejects all authority. Therefore, I find that realistically speaking, there is little, if any, likelihood of his rehabilitation. While I regard the transfer of a juvenile to the adult system as a drastic course of action to be chosen reluctantly and only under exceptional circumstances, I find that these circumstances exist in this case and that adequate protection of the public requires that he be treated as an adult."

The defendant makes various arguments that the findings that led to these conclusions are not supported by the evidence. He claims in particular that the judge erred by finding it likely that he would be released from the juvenile system within a year, referring to evidence that he could have been admitted to the Intensive Care Unit of the Division of Youth Services at Westborough within four months, and that he could be kept at that facility for treatment, by court order if necessary, beyond his eighteenth birthday.

We are not persuaded that the judge erred. The seriousness of the offense is admitted, and the judge could well find that the defendant posed a very serious danger to the public in view of his statements that he would probably commit another rape and that "he might even kill someone." The material summarized in the margin[2] indicates that the judge focused his attention on the central

---

[2] The judge took the defendant's lengthy delinquency record at face value and chose not to minimize its seriousness by attributing it to truancy or other school problems. Prior efforts at rehabilitating the defendant were shown to have been failures and his educational history was characterized by apathy, truancy, and absenteeism. Any miscalculation by the judge of the length of time it would have taken to admit the defendant to the DYS Westborough facility is not fatal. The judge rejected the testimony of the defendant's expert (who was neither a medical doctor nor board certified in his specialty) on the likelihood of rehabilitation at that facility, see Commonwealth v. Watson, 388 Mass. 536, 539 (1983), and placed "considerable significance and weight" on a detailed report from the Judge Baker Guidance Center and the testimony of a physician from that facility. This physician found that the defendant showed "poor compliance [with] a vari-

concern in any of these cases: whether the juvenile is a likely candidate for rehabilitation on the basis of the statutory factors set forth in G.L. c. 119, § 61. We think that the judge's findings are expressed "in fair detail and with logical cohesion," *A Juvenile* v. *Commonwealth,* 380 Mass. 552, 563 (1980), and comply with the statute. See *A Juvenile* v. *Commonwealth,* 370 Mass. 272, 282 n.14 (1976); *Two Juveniles* v. *Commonwealth,* 381 Mass. 736, 744 (1981). Any errors in the findings are inconsequential and do not affect the ultimate determination that the Commonwealth satisfied its burden by proving clearly and convincingly that the defendant was not amenable to rehabilitation as a juvenile. See *Commonwealth* v. *Hill,* 387 Mass. 619, 622 (1982).

2. *The defendant's statements.* We summarize the Superior Court judge's findings of fact (with some supplementation from the record) in connection with the defendant's motion to suppress.

On May 21, 1980, about 2:00 P.M. Detective Yanizzi and Officer Borland of the Hull police went to the defendant's home with a warrant for his arrest.[3] The defendant, who was known to the police from previous encounters, answered the door. He was shown the warrant, immediately placed under arrest, and given Miranda warnings. The defendant stated that he understood his rights. His widowed mother was not at home. The defendant after a permitted change of clothes was transported by police cruiser to the Hull police station. On the way to the station no inquiry was made about the incident.

When the defendant arrived at the station about 2:15 P.M. he was taken to an office shared by Detective Yanizzi and Officer Borland. Detective Yanizzi stayed with the defendant for about five minutes before Captain Card entered the room to complete book-

---

ety of rehabilitative programs [and] his prognosis was guarded." These conclusions were further supported by the report of a doctor on the staff of the Youth Service Center and the testimony of a probation officer who had supervised the defendant's past probations, both of whom recommended transfer. Moreover, the judge stated that the overriding factor for his determination on the defendant's potential for rehabilitation was the fact that he "has never cooperated with any programs previously set up for him and there is absolutely no reason to believe he would cooperate now."

[3] The warrant had been issued on the strength of the victim's positive identification of the defendant.

ing procedures. Captain Card again furnished the defendant with Miranda warnings. Upon completion of the booking procedures the defendant asked Detective Yanizzi to see the arrest warrant again. After examining the warrant for several seconds the defendant exclaimed, ''I did it. I did it. I raped that girl and I need help.'' The judge found no evidence that the police had said anything prior to this time which would have elicited these statements. Detective Yanizzi immediately instructed the defendant to say nothing further until his mother arrived.[4] While awaiting the arrival of the defendant's mother, the police provided the defendant with a soft drink and a cigarette. He was allowed the use of the telephone and made two or three telephone calls. In this interim period, the incident was not discussed.

The defendant's mother arrived at the station between 3:15 and 3:30 P.M. She was advised by Detective Yanizzi that her son had been arrested for rape and that he had admitted committing the offense. She was promptly taken to the room where the defendant was being held, where Detective Yanizzi advised the defendant, in his mother's presence, of his Miranda rights for a third time and asked the defendant if he had anything to say. The defendant stated that he ''wanted to clear up this matter and he wanted some help from the courts before he killed somebody.'' Detective Yanizzi asked the defendant if he had assaulted and raped a woman on May 18, 1980, after 1:00 A.M. The defendant replied, ''Yes, I did it. I was at a party that night and I got drunk. I was at Anastos Corner at about 1:00 A.M., and I grabbed that girl and dragged her up onto the hill and raped her.'' Yanizzi next asked why he committed the crime and beat the victim so badly, and the defendant replied, ''I don't know. I just did it.'' The defendant was then asked if he thought he might kill a girl sometime and he answered, ''Yes.'' The defendant's mother asked her son what was wrong with him and he said, ''I don't know. I was drunk.'' She then

[4] At this juncture, the defendant was informed that efforts were being made to locate his mother. She had been mistakenly directed by the desk officer to meet the defendant at the Hingham District Court on the incorrect assumption that the defendant would be immediately arraigned. Upon discovering the error, the police promptly notified the court to advise the defendant's mother that her son was being held at the police station.

asked him where he got the liquor, and he answered, ''Come on, Ma.''[5] The defendant declined to discuss the matter further. While the defendant was at the station, he was not handcuffed or otherwise restrained except for being confined to Detective Yanizzi's office.

The judge found that the defendant was familiar with his constitutional rights as a result of other contacts with the police and his representation by a lawyer on another charge brought about two weeks prior to this arrest. The judge expressly rejected the testimony of the defendant and his mother claiming a denial of his rights as either not credible or the product of ''a selective memory.'' The judge also found that the police had not engaged in any coercive conduct, either physical or psychological; that the atmosphere in Detective Yanizzi's office was not imposing; that the police conscientiously sought to protect the defendant's rights; and that, although the defendant appeared at times to be emotional and nervous, he was able to make intelligent, voluntary, and rational decisions. After considering the facts in light of the legal principles applicable to the waiver of Miranda rights in general and the then prevailing standards on that subject relating to juveniles, see *Commonwealth* v. *Cain,* 361 Mass. 224, 228 (1972); *Commonwealth* v. *Andrade,* 8 Mass. App. Ct. 653, 655-656 (1979), the judge concluded that the defendant's statements should, with certain exceptions, be admitted at the trial.[6]

(a) The defendant's first statements (''I did it. I did it. I raped that girl and I need help'') were made shortly after the completion of the booking procedure. With respect to these statements, the defendant argues that there is no evidentiary support for a conclusion that he had voluntarily and intelligently waived his constitutional rights and urges that the statements should have been sup-

---

[5] Some of these statements appear to go beyond the testimony in the transcript. No party objects to them as lacking support in the evidence. We assume, to the extent that the statements are not covered by the testimony, that they are contained in police reports placed before the judge.

[6] The judge wisely suppressed the defendant's statement that ''he wanted some help from the courts before he killed somebody'' and the defendant's affirmative response to Detective Yanizzi's inquiry whether ''he might kill a girl sometime.'' The judge ruled that the prejudice that might flow from the admission of these statements outweighed their probative value.

pressed. We need not address the point, however, because we are satisfied that the statements were not the product of police interrogation but rather were volunteered by the defendant.

The protections of the Miranda decision are designed to ensure that an accused will make a willing and intelligent choice to submit to police interrogation about the details of a crime. However, "[v]olunteered statements . . . are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda* v. *Arizona,* 384 U.S. 436, 478 (1966). See *Commonwealth* v. *Curtis,* 388 Mass. 637, 650 (1983); *Commonwealth* v. *Ryan,* 11 Mass. App. Ct. 906, 907 (1981). To ascertain whether a statement is voluntary or the result of police interrogation the United States Supreme Court has fashioned the following test: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect [looked upon from the perspective of the suspect]. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But since police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island* v. *Innis,* 446 U.S. 291, 301-302 (1980) (emphasis original).

The judge found no evidence that the defendant's inculpatory statements were the product of any police interrogation. The record supports this finding and indicates that the police scrupulously avoided questioning the defendant until his mother arrived. The event triggering the statements was the defendant's request to see the warrant again, a request which in essence asked the officers to perform a function normally attendant to arrest and custody. There was nothing in Detective Yanizzi's response to that request which should have alerted him to the fact that the defendant might make an incriminating statement. We think it would be unreasonable in

these circumstances to have expected the police to be clairvoyant.[7] We see nothing in the recent decision in *Commonwealth* v. *A Juvenile,* 389 Mass. 128, 134 (1983) (*Juvenile*), which would require the suppression of volunteered statements by a mature juvenile. In light of these circumstances and the defendant's experience with the law (as will be outlined in 2[b] of this opinion, *infra*), we conclude that the initial incriminating statements were admissible.

(b) The incriminating statements made after the defendant's mother arrived at the station were the product of police interrogation. As to these statments, the defendant renews his argument that the Commonwealth failed to meet the burden imposed on it to demonstrate that he voluntarily and intelligently waived his rights.

Special caution, of course, must be exercised in examining the validity of inculpatory statements made by juveniles. *Commonwealth* v. *Cain,* 361 Mass. at 228; *Commonwealth* v. *Andrade,* 8 Mass. App. Ct. at 655. Nevertheless, "[a] minor may waive constitutional rights and make a confession which is admissible against him." *Commonwealth* v. *Daniels,* 366 Mass. 601, 605 (1975), and cases cited. The decision whether to admit statements made by a minor "must be determined by an examination of 'the totality of all the . . . circumstances — both the characteristics of the accused and the details of the interrogation.' *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 226 (1973)." *Commonwealth* v. *Daniels,* 366 Mass. at 606. In addition, even if the statements are made by a juvenile over age fourteen, a valid waiver will not ordinarily occur in the absence of "a meaningful consultation with the parent, interested adult, or attorney" unless the circumstances "demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." *A Juvenile,* 389 Mass. at 134.

The facts found by the judge indicate that the defendant did not have an opportunity to consult with his mother prior to Detective Yanizzi's questioning. We therefore must consider the case in

---

[7]Moreover, as soon as the incriminating statements were blurted out, the defendant was instructed to say nothing further until he had the opportunity to consult with his mother.

light of the special requirements of the *Juvenile* decision. The judge was unable to weigh these requirements fully because the *Juvenile* case had not been decided when the defendant's motion to suppress was heard.[8] Nevertheless the record supports the conclusion that the statements were admissible under the *Juvenile* standards.

There was no evidence that the defendant had been drinking prior to his arrest. Nor was there any evidence of mental impairment or the use of drugs. See *Commonwealth* v. *Wilborne,* 382 Mass. 241, 251-252 (1981). Despite a learning disability,[9] the defendant had reached the tenth grade at school[10] and he was able to hold down a job. The defendant was furnished Miranda warnings three times before he made the statements now under consideration. He stated that he understood these rights and he further admitted in cross-examination that he was especially aware of his right to have the advice of counsel. The defendant's criminal record indicates a level of experience well beyond his years,[11] and suggests the fact that the defendant was thoroughly schooled in police procedures. Indeed, the judge found, based upon the evidence presented, that the defendant had two weeks before this arrest exercised his right to consult with counsel and after consultation had decided to remain silent. The judge also personally ob-

---

[8] The verdicts in this case were returned on September 11, 1981. The *Juvenile* case was decided on May 10, 1983, but applies to all cases pending on direct appeal on that date where the issue has been preserved. 389 Mass. 134 n.4. This case satisfies those conditions.

[9] The defendant is dyslexic but was not asked to read anything at the police station (apart from the warrant which he asked to read). Testing at facilities of the Youth Service Center found him to be "intellectually functioning in the dull normal range of intelligence . . . [with] a verbal I.Q. score of 85, a performance I.Q. score of 96 and a full scale I.Q. score of 89."

[10] The defendant completed the first six grades of public school and completed the balance of his formal education in special schools or State facilities.

[11] Since 1975, the defendant has been before the court on charges of arson and attempted arson, larceny, malicious destruction of property, breaking and entering both in the daytime and the nighttime, assault and battery, threatening bodily harm, possession of a controlled substance, and on charges of unlawful possession and transportation of alcoholic beverages. We also note the defendant's canny comment to the victim as he left her that she should not report the crime "because he was a juvenile and nothing would happen to him anyway."

served that '' [d]uring his testimony, the defendant appeared to be mature and capable and showed no discernible difficulty understanding questions or reading from portions of a transcript related to District Court testimony.'' There was ample evidence to support the judge's findings that the defendant was treated well at the police station, kept in a non-coercive environment, and not subjected to physical or psychological pressures. The defendant's argument that the police purposely misled his mother in order to confuse him receives no support in the record. And, of course, the judge (as he had every right to do) rejected as untruthful the defendant's testimony that he had been denied his rights.

The judge considered the totality of the circumstances, carefully weighed the conflicting evidence, and made findings on the basis of a record which discloses that the defendant is experienced in police procedures. We will not lightly disturb a judge's determination which has such evidentiary support and which is also based on an assessment of the witnesses brought before the court. *Commonwealth* v. *Hooks,* 375 Mass. 284, 289 (1978). We conclude that a valid waiver has been shown despite the lack of parental consultation. None of the defendant's other arguments persuades us to the contrary.[12] The judgments of conviction on indictment nos. 74684 and 74685 are affirmed.

*So ordered.*

---

[12] There is a much overdrawn attempt to analogize the case to the situation discussed in *Commonwealth* v. *Meehan,* 377 Mass. 552 (1979). *Meehan,* however, involved a ''defendant, eighteen years of age, with a poor educational background, uninformed of his right to reach his family or friends, his judgment impaired through intoxication [who] confessed after being told that the case against him was established and after receiving assurance that the confession would assist his defense.'' 377 Mass. at 567-568. The circumstances found controlling in *Meehan* are not present here. There is also no basis here for applying any ''cat out of the bag'' analysis to the second set of statements since that rule has no application to the statements under consideration. See 377 Mass. at 569-570.

The defendant also argues the application of *Commonwealth* v. *Sherman,* 389 Mass. 287 (1983), to the waiver issue in this case. The testimony to support the argument comes from defendant and was expressly rejected by the judge. The testimony of Detective Yanizzi on the issue makes it clear that the defendant's lawyer instructed the police not to talk to the defendant with respect to a different charge arising two weeks before this arrest. The judge could have found that the police had no knowledge of any lawyer representing the defendant in connection with this charge.