v.

STATE of Alaska, Appellee.

No. A–1330.

Court of Appeals of Alaska.

Sept. 5, 1986.

Valerie Tehan, Asst. Public Advocate and Brant McGee, Public Advocate, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before COATS and SINGLETON, JJ., and Moore, Justice.*

MOORE, Justice.

This is an appeal by W.M.F., a minor, from an order by Superior Court Judge Karl Johnstone, finding W.M.F. not to be amenable to treatment as a juvenile and

---

* Moore, Alaska Supreme Court Justice, sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

waiving children's court jurisdiction over W.M.F. W.M.F. contends that use of the "preponderance of the evidence" standard as the standard of proof in a waiver hearing to show nonamenability to treatment of a juvenile violates due process. She also contends that the court abused its discretion in denying a one-year postponement of the phase of the waiver hearing in which the court was to decide amenability to treatment. Further, she argues that the court abused its discretion in finding that W.M.F. is not amenable to treatment by the age of twenty. We affirm the superior court for the reasons set out below.

## FACTS

On April 22, 1985, W.M.F., age fourteen, and Cordell Boyd, age nineteen, forced their way at gunpoint into the house of Tom and Ann Faccio and Emilia Elliott. W.M.F. initially struggled with Mr. Faccio, age sixty-nine, during which her .22 caliber handgun discharged. Ms. Faccio, age seventy, entered the kitchen, where the disturbance was taking place. Boyd demanded money from Mr. Faccio and was given approximately $300 at that time. Boyd directed W.M.F. to find Ms. Elliott, age seventy-five, who was found in the garden and brought back into the house. Boyd and W.M.F. ordered the three victims to sit down on the living room couches. While there, Ms. Elliott pointed out to W.M.F. that she did not have a mask on, and W.M.F. became concerned that she could be identified. Boyd checked the living room for valuables and then went upstairs to obtain neckties from an upstairs bedroom in order to tie up the victims.

Boyd returned downstairs and directed W.M.F. to take Ms. Faccio upstairs because she appeared to be having a heart attack. While W.M.F. took Ms. Faccio upstairs, Boyd began tying up Ms. Elliott and Mr. Faccio. W.M.F. returned downstairs to retrieve her gun and then went back upstairs. While Boyd was tying up Mr. Faccio, a shot was heard from upstairs. Boyd ran upstairs to find Ms. Faccio kneeling at the foot of the bed praying. W.M.F. was laughing. W.M.F. had attempted to shoot Ms. Faccio in the head, but Ms. Faccio had ducked and the bullet had missed her. At that moment, Boyd looked downstairs and noticed that Mr. Faccio was getting loose from his bindings, so he immediately ran downstairs to finish tying up Mr. Faccio. While tying up Mr. Faccio, Boyd heard a second shot from upstairs. Boyd went back upstairs and found W.M.F. holding the gun over the body of Ms. Faccio, who had been shot in the head at a distance of three inches. W.M.F. later indicated that Ms. Faccio had been pleading for her life and W.M.F. had become angry and said, "Shut up, bitch" as she pulled the trigger. When asked why she had shot Ms. Faccio, W.M.F. indicated that it was because Ms. Faccio could identify her.

Mr. Faccio called out from downstairs, asking what was wrong. Boyd told him that his wife had just been shot, and Mr. Faccio started crying. Subsequently, both Boyd and W.M.F. went downstairs. W.M.F. walked directly to Ms. Elliott and shot her in the head, killing her. Boyd then obtained more money from Mr. Faccio, (approximately $400) and, according to W.M.F., Boyd proceeded to shoot Mr. Faccio twice, first in the chest, and a second time in the head to end Mr. Faccio's misery. Boyd asserts that W.M.F. shot Mr. Faccio in the chest, and Boyd subsequently shot Mr. Faccio in the head to end his misery.

After the murders, Boyd and W.M.F. immediately left the house without taking any other property. They went to the nearby home of Boyd's sister, dropping the murder weapon in the woods along the way.

## PROCEEDINGS

On June 12, 1985, a petition for adjudication of juvenile delinquency and a petition for waiver of juvenile jurisdiction were filed against W.M.F. The waiver hearing was held before Judge Karl Johnstone in November and December 1985.[1]

---

1. This court affirmed the superior court's decision to permit the family of the victims to at-

## DISCUSSION

W.M.F. first argues that the "clear and convincing" standard is the standard of proof that should be required in a waiver hearing to show nonamenability of a juvenile to treatment and argues that the "preponderance of the evidence" standard, which is the standard currently required, violates due process.

The Alaska Supreme Court adopted the "preponderance of the evidence" test as the standard of proof required by the state to show a minor's nonamenability to treatment by age twenty. *In re F.S.*, 586 P.2d 607, 611–12 (Alaska 1978), *rev'd on other grounds, State v. F.L.A.*, 608 P.2d 12 (Alaska 1980). As a supreme court case, *In re F.S.* is binding upon this court. Thus, W.M.F.'s argument that this court should overrule *In re F.S.* because the "clear and convincing" test is a better standard of proof cannot and will not be considered. The supreme court, however, has not considered the issue of whether the "preponderance of the evidence" test violates due process. Thus, that question will be analyzed.

██ A juvenile offender has no constitutional right to be tried in a juvenile court. *Woodard v. Wainwright*, 556 F.2d 781, 785 (5th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978). Rather, it is a right granted by the state legislature, and the legislature may restrict or qualify the right as it desires, so long as no arbitrary or discriminatory classification is involved. *Id.* The Supreme Court has not prescribed criteria for, or the nature and quantity of evidence that must support, a decision to transfer a juvenile for trial in adult court. *Breed v. Jones*, 421 U.S. 519, 537, 95 S.Ct. 1779, 1790, 44 L.Ed.2d 346, 360 (1975); *Stokes v. Fair*, 581 F.2d 287, 289 n* (1st Cir.1978), *cert. denied*, 439 U.S. 1078, 99 S.Ct. 858, 59 L.Ed.2d 47 (1979).

Where a state by statute entrusts the decision to charge a juvenile as an adult or a juvenile to the judiciary, some formal mechanisms are required to ensure fundamental fairness, and the statute must be interpreted in the context of constitutional due process. *Stokes v. Fair*, 581 F.2d at 289. *See also Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The basic requirements of due process and fundamental fairness attach to waiver hearings. *Kent v. United States*, 383 U.S. at 557, 86 S.Ct. at 1055, 16 L.Ed.2d at 95; *P.H. v. State*, 504 P.2d 837, 845 (Alaska 1972). It is not clear, however, what precise requirement due process demands. The question of who must bear the burden of proof and what the burden of proof must be in a waiver hearing to comport with due process has not been decided by any court of record.

The United States Supreme Court has outlined three factors to be considered in determining the minimum standard of proof allowed by due process: the private interests affected, the public interests, and a societal judgment about how the risk of error should be distributed between the litigants. *Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 607 (1982). Here, the private interest, the interest of the minor, is important because the waiver hearing can mean the difference between six years' imprisonment and a life sentence. *See Kent v. United States*, 383 U.S. at 557, 86 S.Ct. at 1055, 16 L.Ed.2d at 95.

The public's interest is also very important. The public has an interest in rehabilitating wayward youths who are rehabilitatable in their youth. *In re F.S.*, 586 P.2d at 609–10; *P.H. v. State*, 504 P.2d at 845. There are equally important interests in: protecting the public from youths who are not so quickly rehabilitated: providing a longer period of rehabilitation for youths not so quickly rehabilitated, showing community condemnation for the crimes committed, and deterring the defendant and others from committing the crimes in the future. *See State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970) (goals of adult sentencing); AS 47.10.060(a), (d); Alaska R. Children's P. 1(c).

tend the waiver hearing. *W.M.F. v. Johnstone,*

711 P.2d 1187 (Alaska App.1986).

The third factor is the allocation of the risk of error. Alaska Statute 47.10.060(d) specifies that a juvenile is unamenable to treatment and therefore waivable to adult court if he/she "probably cannot be rehabilitated" in the juvenile system before his/her twentieth birthday. In *In re F.S.*, the Alaska Supreme Court concluded that "probably" more closely matched the "preponderance of the evidence" standard than the "clear and convincing" standard. *In re F.S.*, 586 P.2d at 612. The court perceived the legislature to have allocated the risk of error in that way. This allocation reflects the equal importance ascribed to rehabilitation of the juvenile and protection of the public. *See* Alaska R. Children's P. 1(c). It takes into account the importance of both the interest of the juvenile and the interest of the public. The allocation does not appear to be unreasonable in light of the contrary interests. The allocation also does not appear to be unreasonable in light of the standards and burdens of proof applied in other jurisdictions.

Currently, the burden of proof varies from jurisdiction to jurisdiction. In some jurisdictions, the burden is on the juvenile. *See, e.g., Ramona R. v. Superior Court (People)*, 37 Cal.3d 802, 210 Cal.Rptr. 204, 693 P.2d 789, 791 (1985) (where the minor bears the burden to produce substantial evidence that he/she is amenable to treatment if charged with specified felonies). In others, the burden of proof is on the state, and the standard of proof may be the "clear and convincing" standard, *see, e.g., Commonwealth v. King*, 17 Mass.App. 602, 460 N.E.2d 1299, 1302 (1984); *In re Seven Minors*, 99 Nev. 427, 664 P.2d 947, 953 (1983), it may be the lower but more common "preponderance of the evidence" standard, *see, e.g., In re F.S.*, 586 P.2d at 611–12; *State v. Jacobson*, 33 Wash.App. 529, 656 P.2d 1103, 1104–05 (1982), or may merely be the requirement of "substantial evidence," *see, e.g., In re White*, 227 Kan. 881, 610 P.2d 1114, 1118–19 (1980); *K.C.H. v. State*, 674 P.2d 551, 552 (Okla.Crim.App. 1984). Thus, while Alaska's "preponderance of the evidence" standard may not be the highest standard of proof, neither is it

the lowest. Were that standard of proof to be violative of due process, the lower standards—the "substantial evidence" standard and the standard placing the burden of proof on the minor defendant—would also be violative of due process. While this does not mean that the "preponderance of the evidence" standard is necessarily constitutional, it does indicate that many jurisdictions find it to be a reasonable allocation of the risk of error.

W.M.F. presents case law supporting her proposition that the "preponderance of the evidence" standard violates due process. The cases W.M.F. cites, however, do not concern juvenile waiver hearings. They concern civil commitment proceedings (*Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)), deportation (*Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)), denaturalization (*Schneiderman v. United States*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)), and termination of parental rights (*Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). None of these situations are sufficiently analogous to compel a conclusion that the "preponderance of the evidence" standard is similarly violative of due process.

■ Thus, after considering the interests and the reasonableness of the allocation of the risks, our ultimate conclusion is that use of the "preponderance of the evidence" standard as the standard of proof in a waiver hearing to show nonamenability of a juvenile to treatment is not violative of due process.

■ W.M.F. next contends that the superior court abused its discretion in denying a one-year postponement of the phase of the waiver hearing in which the court was to decide W.M.F.'s amenability to treatment. W.M.F. presents no authority supporting her argument that the court erred in not allowing a continuance. Additionally, the testimony of W.M.F.'s two expert witnesses does not indicate that a one-year continuance would have been a sufficient or necessary amount of time to enable them to

ascertain whether W.M.F. is amenable to treatment. Only one of the two, Dr. Geeseman, indicated that any further interaction would be necessary but did not indicate why additional interviews were not conducted between her last interview with W.M.F. on November 4, and November 27, 1985, when she testified. Dr. Geeseman also did not indicate how many more interviews and what period of time would have been sufficient to make her conclusion. Furthermore, in spite of Dr. Geeseman's assertions that more interviews were necessary to conclude whether or not W.M.F. was amenable to treatment, Dr. Geeseman concluded that W.M.F. was amenable to treatment. Thus, it appears that even Dr. Geeseman ultimately concluded that no further interviews were necessary to make her conclusion.

Denial of W.M.F.'s motion also seems justified by the state's allegation that it would be prejudiced. As the state asserts, a one-year continuance would have created a hardship because witnesses' memories would have faded and important details could have been lost in the interim. Also, Sellers, the informant, and Boyd, W.M.F.'s accomplice, whose motive to testify is to exculpate himself, are currently waiting for the completion of the ultimate trial. A postponement would have resulted in great inconvenience to both of them and could have hindered the sentence of Boyd because of the lengthy interim. During the lengthy interim, Sellers and Boyd could also have become less cooperative, feigning lost memories or changing their stories. In addition, W.M.F. herself would be prejudiced because she would be compelled to wait longer for termination of legal proceedings and for commencement of rehabilitative treatment.

Furthermore, it is important to note that a waiver of jurisdiction can be made without the benefit of any psychological testimony from experts. *See J.R. v. State,* 616 P.2d 865, 867 (Alaska 1980). Thus, we

conclude that the court did not abuse its discretion in denying a one-year postponement to determine W.M.F.'s amenability to treatment.

■ Finally, W.M.F. argues that the superior court abused its discretion in finding that W.M.F. is not amenable to treatment by age twenty. To justify waiver, the superior court judge must find, on sufficient evidence, that probable cause is established for believing that the minor committed the act the minor was charged with in the petition and which, if committed by an adult, would constitute a crime [2] and that the minor is not amenable to treatment by the age of twenty. *See In re F.S.,* 586 P.2d at 609–10; *In re J.H.B.,* 578 P.2d 146, 149 (Alaska 1978); AS 47.10.060(a). There must be a thorough examination made in determining probable cause and amenability to treatment. Without such an examination, there is no evidentiary basis for a waiver decision. *R.J.C. v. State,* 520 P.2d 806, 807 (Alaska 1974); *P.H. v. State,* 504 P.2d at 846.

■ There are four factors that may be considered by the superior court when inquiring into the amenability issue: 1) the seriousness of the offense the minor is alleged to have committed, 2) the minor's history of delinquency, 3) the probable cause of the minor's delinquent behavior, and 4) the facilities available for treating the minor. *J.W.H. v. State,* 583 P.2d 227, 228 (Alaska 1978); AS 47.10.060(d). All four factors need not be resolved against the minor to justify waiver, and the court is not required to make an arithmetic calculation of the weight to be given to each factor. *P.H. v. State,* 504 P.2d at 845.

The court must make an evidentiary record and make written findings of fact for each of the four factors. *In re F.S.,* 586 P.2d at 614; Alaska R. Children's P. 3(h). These findings must be supported by substantial evidence. *In re F.S.,* 586 P.2d at 614. Based on these findings, the superior court must, using its sound discretion,

---

**2.** W.M.F. does not contest the superior court's finding that there is probable cause to believe that she committed the first-degree murder of the three victims either as principal or accomplice.

make a decision concerning the minor's amenability to treatment. *In re F.S.*, 586 P.2d at 614. The court must determine whether the minor probably cannot be rehabilitated by age twenty, so a determination of nonamenability must be shown by a preponderance of the evidence. *In re F.S.*, 586 P.2d at 612.

### a) Seriousness of the Offense

First-degree murder is among the most serious of all offenses. The court correctly notes that there is no more serious crime under Alaska law. The court also concluded that these particular killings are among the most serious examples of first-degree murders. Judge Johnstone found that the manner in which the crimes were committed showed extreme callousness and cruelty. He concluded that, because W.M.F. did not wear a mask, because W.M.F. bragged about her family being involved in murders, knew of other killings, and indicated a desire to kill, and because she laughed about the murders to others and showed no remorse, W.M.F. had premeditated the murders, and they were perpetrated for the thrill of it.

There is substantial evidence supporting the court's findings of facts.[3] *See In re F.S.*, 586 at 614. In addition, the conclusions drawn from these facts were well within the court's discretion to make. *See In re F.S.*, 586 P.2d at 614; *P.H. v. State*, 504 P.2d at 845. Thus, we find that the court properly considered this factor in making its determination of W.M.F.'s amenability to rehabilitation. *See J.W.H. v. State*, 583 P.2d at 228.

### b) History of Delinquency

The superior court noted that W.M.F. had never been adjudicated a delinquent but found that she had committed two shoplifting offenses prior to meeting Boyd. The court also found that, after meeting Boyd, W.M.F. participated in many burglaries in the Anchorage area. The court noted that W.M.F. had worked as a prostitute before and during her relationship with Boyd. The court also found that W.M.F. had consumed alcohol and illegal drugs to excess prior and during her relationship with Boyd. W.M.F. does not challenge any of the court's factual findings, and all of the court's factual findings are supported by substantial evidence.[4] *See In re F.S.*, 586 P.2d at 614. It is clear from the superior court's factual findings that the court properly considered W.M.F.'s history of delinquency. *See J.W.H. v. State*, 583 P.2d at 228.

### c) Probable Cause of the Crime

The superior court noted in its findings of facts and conclusions of law that W.M.F. was raised by her divorced mother, who was an alcoholic and who was living with an abusive drug addict. The court found that W.M.F. had a learning disability and had been held back in school but was "street-wise." The court noted that W.M.F. dressed in sexually provocative attire and was generally unable to maintain lasting relationships with persons her own age and noted that W.M.F. had at least six sexual partners prior to her relationship with Boyd. The court also found that W.M.F. had been using alcohol and marijuana for over three years prior to meeting Boyd and had begun using cocaine, LSD, and amphetamines after meeting Boyd. The court also noted that W.M.F. was absent from school half of her school days in sixth and seventh grade and, in early 1985, ran away from home.

The court also found that, during their relationship, and until the killings, W.M.F. and Boyd were co-equal in control of their relationship. W.M.F. was of equal intelligence to Boyd, had her own opinions, and was not unduly influenced by Boyd.

The court noted that four of the five experts who testified found her personality incompatible with rehabilitation. Judge Johnstone noted that W.M.F. has low moti-

---

**3.** The only exception is that the court stated that Ms. Faccio was seventy-one years old and in poor health, when she was actually seventy years old and in good health.

**4.** The only exception is that we could not substantiate the court's finding that W.M.F. had committed burglaries or thefts with her mother's boyfriend's son.

vation for treatment, is rebellious towards authority figures, lacks remorse, and has little insight into her problems. He noted that W.M.F.'s actions prior to the hearing indicate that she is impulsive, manipulative, and a chronic liar, and has no conscience, poor judgment, and a low tolerance to frustration. The court concluded that the probable cause of W.M.F.'s delinquency is a personality disorder, which, if diagnosed in an adult, would be untreatable.

We find these findings and conclusions substantially supported in the record by the psychological experts and other witnesses' testimony. *See In re F.S.*, 586 P.2d at 614. We also find that the superior court properly considered the probable cause of the crime. *See J.W.H. v. State*, 583 P.2d at 228.

### d) Availability of Facilities Capable of Treating W.M.F.

The court properly considered the availability of facilities capable of treating W.M.F. *See J.W.H. v. State*, 583 P.2d at 228. The court noted that McLaughlin Youth Center is the only available juvenile treatment facility. If placed in McLaughlin, W.M.F. could be detained only until age twenty. AS 47.10.060(d); *In re F.S.*, 586 P.2d at 609–10. The court noted that, while there, W.M.F. would be able to associate with other criminals.

The court noted that most of W.M.F.'s treatment would be by a staff that was not specially educated or trained to rehabilitate a juvenile murderer. The court noted that McLaughlin was able to enter into contracts with expert counselors but was not legally required to do so, and with budgetary constraints, these contracts might be curtailed. The court also found that McLaughlin has had mixed results with juveniles who had committed murder. Some have been released only to commit other very serious crimes. We find these findings to be supported by substantial evidence in the record. *See In re F.S.*, 586 P.2d at 614. In addition, while the court made no specific finding that McLaughlin

would be inadequate, it implied as much. Based on the testimony of the Associate Superintendent at McLaughlin and the psychiatrists and psychologists who compared McLaughlin's treatment program to W.M.F.'s needs, the court would have been justified in finding that McLaughlin was not capable of treating and rehabilitating W.M.F. *See In re F.S.*, 586 P.2d at 614.

### e) The Court's Conclusion

The superior court ultimately concluded that W.M.F. is not amenable to treatment before the age of twenty. We concur that the state proved by a preponderance of the evidence that W.M.F. was not amenable to treatment and conclude that the superior court did not abuse its discretion in finding that W.M.F. would not be rehabilitated by age twenty and waiving children's court jurisdiction over W.M.F. *See In re F.S.*, 586 P.2d at 612, 614.

This case is similar to *C.G.C. v. State*, 702 P.2d 648 (Alaska App.1985). In *C.G.C. v. State*, we affirmed a waiver of a minor into adult court, where the fifteen-and-one-half-year-old minor shot and killed three people, including his mother and brother, and shot at four others all in the same day. In spite of C.G.C.'s youth, his lack of prior arrests or adjudications for delinquency, and a favorable prognosis for treatment, we affirmed waiver because we found the superior court to have made careful and comprehensive review of the evidence in its written findings and conclusions of law and found them not to be clearly erroneous. We did not find it improper for the court to have placed substantial reliance on the fact that C.G.C. had exhibited extreme unprovoked violence.

The present case is similar to *C.G.C.* in that W.M.F. is quite young and has not previously been adjudicated a delinquent. The cases differ in that C.G.C. had a favorable prognosis for treatment while W.M.F. does not. That fact gives additional support to a finding of waiver. The cases are also similar in that the judges in both made careful and comprehensive review of the

evidence in their findings and conclusions of law, which we have not found to be clearly erroneous. Also, both cases concerned extreme unprovoked violence which resulted in the death of three people. As we noted in *C.G.C.*, that is something that can be relied on to support waiver.

The court in this case did not specify how much weight it placed upon each factor. We find, however, that, after considering all the testimony and the various factors and after discounting the facts found in error, the conclusion reached was not an abuse of discretion.

The order of the superior court is AFFIRMED.

BRYNER, C.J., not participating.