Commonwealth vs. Joseph A. Stone.

No. 06-P-616.

Berkshire. September 7, 2007. - December 10, 2007.

Present: Cypher, Kantrowitz, & Cohen, JJ.

*Burning a Dwelling House. Evidence,* Voluntariness of statement. *Practice, Criminal,* Instructions to jury, Assistance of counsel.

At the trial of an indictment of arson of a dwelling house in violation of G. L. c. 266, § 1, a Superior Court judge properly allowed testimony that the defendant had previously received Miranda warnings in an unrelated matter on the issue of the voluntariness of the defendant's present waiver of Miranda rights, notwithstanding the defendant's limited intelligence. [804-807]

Viewed in context, the instructions of the judge at a criminal trial to the jury, that police officers give Miranda warnings to persons taken "into custody," did not give rise to a substantial risk of a miscarriage of justice, where the instructions did not suggest to the jury that the defendant had been under arrest when he was given Miranda warnings. [807-808]

This court declined to address a criminal defendant's claims of ineffective assistance of counsel, raised for the first time on appeal, where he did not raise them through a motion for a new trial, and where the record of the direct appeal was insufficient to show the purported ineffective assistance. [808-810]

Indictment found and returned in the Superior Court Department on March 26, 2004.

The case was tried before *Daniel A. Ford,* J.

*Roger A. Cox* for the defendant.

*Karen L. Carlo,* Assistant District Attorney, for the Commonwealth.

Cypher, J. A Superior Court jury returned a guilty verdict against the defendant, Joseph A. Stone, for arson of a dwelling house in violation of G. L. c. 266, § 1. The defendant claims on appeal that the trial judge erred in (1) allowing testimony that the defendant had previously received Miranda warnings in an

unrelated matter; and (2) instructing the jury that police officers give Miranda warnings to persons taken "into custody." He also contends that trial counsel provided ineffective assistance by allowing an expert to give prejudicial testimony, failing to request a limiting instruction in response to the testimony about the defendant's past experience with Miranda warnings, and requesting and failing to object to the "into custody" language of the jury instruction on Miranda warnings. We affirm.

*Factual background.* The jury could have found the following facts. We reserve additional facts for discussion where relevant. At about 4:00 P.M. on February 7, 2004, Megan Moore encountered the defendant on her way home from a local restaurant. They both lived in apartments in the Noble Milne Building (building), located at the corner of First and Fenn Streets in Pittsfield. The defendant carried a flashlight that he had borrowed from a local restaurant, and told Moore, "I got to check something out in the basement." Moore pointed out that there were lights there. He replied, "Well, where I have to look, it's not bright enough."

Chief Stephen Duffy of the Pittsfield fire department received a telephone call at about 7:30 P.M. on February 7, 2004, about a multiple-alarm fire at First and Fenn Streets. Fire personnel attacked the fire, primarily located in the basement, through the first floor. Duffy removed fire personnel from the building as the first floor became unsafe. Fire personnel spent at least three or four days fighting the fire from the outside. After investigation, Duffy determined "that the fire was set intentionally."

On the night of the fire, Michael Valuski, one of the owners of the building, arrived at the scene after telephone calls from his brother Mark, who was the other owner, and a tenant. Michael gathered his tenants, did a headcount, and took them to a café across the street from the building. The defendant aided him in the effort. The defendant excitedly told Michael that he had gone door-to-door, notifying other tenants of the fire so that they could get out of the building. He made similar comments in a similar manner repeatedly to fire personnel, media, and other tenants. Michael and the defendant had a relationship that was "comfortable" and "pleasant." They also had an arrangement in which the defendant did minor maintenance and repair on the building in order to offset his overdue rent.

On February 10, 2004, the Berkshire Gas Company hired Fire Science Technologies to determine whether the gas service had been responsible for the fire. Daniel Slowick, an investigator with Fire Science Technologies, concluded that the point of origin was the rear corridor of the basement, against the east wall. He further concluded that neither the electrical system nor the gas service could have caused the fire.

Two weeks later, on March 4, 2004, Detective Thomas Bowler of the Pittsfield police department called the defendant and asked him to come to the police station to discuss the investigation of the fire. Bowler, along with State police Trooper Andrew Canata, a detective with the office of the State fire marshal, met with the defendant at approximately 8:00 P.M. The defendant appeared "a little jovial," "relaxed," and sober. He brought with him a statement handwritten on an inventory slip (first statement). Bowler had not asked him to prepare a statement. The first statement focused primarily on the actions of the defendant on the night of the fire and cast him in a heroic light.

Bowler and Canata decided that they wanted to take an additional statement in order to elaborate upon the defendant's description of the chain of events. Even though the defendant was not under arrest at the time, Bowler gave him a form printed with Miranda warnings. The defendant read the form and signed it twice without asking any questions. At about 8:10 P.M., the defendant gave the second statement in a "relaxed, comfortable, [and] cooperative" manner. In addition to the contents of the first statement, the second statement also consisted of the defendant's history as the Valuskis' tenant, his arrangement with them to pay his overdue rent, and additional details about what he did on the night of the fire. He dated and signed the statement at 10:30 P.M.

Bowler and Canata then told the defendant that they wanted to question him again because they did not believe either statement. The defendant reiterated the points he made in the first statement, but Bowler told him that they believed that he had started the fire. Bowler added that they "were looking for [the defendant's] cooperation in the investigation." The defendant "asked if this would be something that would be able to be kept between the three of [them]." Bowler and Canata replied that it would not and reminded the defendant of his Miranda rights.

The defendant agreed to give another statement (third statement) and then told Bowler and Canata that he had found a jacket in the eastern corridor of the basement during his building check on the day of the incident. He set it on fire with a lighter that he had with him. He said that he had started the fire because he "was stressed out at a lot of people in the building," and he "was mad at Mike and Mark Valuski for not fixing things in the apartment." He also stated, "I . . . hate drugs and could smell pot or marijuana and other drugs that tenants were using." He further remarked that his "intention was not to hurt anyone," and that he "felt that nobody there appreciated what [he] did or had done." He appeared to be nervous while giving the third statement, and his eyes were watery.

Bowler formally arrested the defendant at 11:42 P.M. and took him downstairs for a formal booking process, which was recorded with audio and visual equipment.[1] He received Miranda warnings again and stated that he understood them. His demeanor "was much more serious" than it was when he gave the third statement.

At trial, both the Commonwealth and the defendant called psychologists as experts to testify about the defendant's borderline mental retardation. The defendant has an intelligence quotient (IQ) in the low to mid-seventies. He took special education classes throughout childhood and adolescence and stopped going to school when he was fifteen or sixteen years old.

Dr. Ann Pratt, the psychologist who testified for the defendant, gave the opinion that the defendant is substantially deficient in his ability to confess and to waive his Miranda rights voluntarily. She concluded that he has difficulty in acting with common sense and social judgment and that he tends to be compliant and

---

[1] Neither the second nor the third statement given by the defendant in February, 2004, was recorded by audio or visual equipment. At the time of the interview, the Pittsfield police department did not record statements with audio or visual equipment. The Supreme Judicial Court ruled in August, 2004, that "a defendant whose interrogation has not been reliably preserved by means of a complete electronic recording should be entitled, on request, to a cautionary instruction concerning the use of such evidence." *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447 (2004). Since the *DiGiambattista* decision, the Pittsfield police department has enforced a policy that all statements must be recorded with either audio or visual equipment.

suggestible in response to authority. Dr. Roger Golden, the psychologist who testified for the Commonwealth, came to conclusions that were similar to Dr. Pratt's but ultimately determined that the defendant is capable of making a valid waiver of Miranda rights. He partially based his analysis upon results of two tests measuring understanding of Miranda rights and suggestibility.

*Discussion.* 1. *Admission of testimony that the defendant had previously received Miranda warnings in an unrelated matter.* The defendant claims on appeal that the trial judge erred in allowing State police Trooper Randy Thomas's testimony that during a prior investigation, the defendant had received Miranda warnings and had waived them, because the prejudicial effect of the evidence outweighed the probative value.[2] The defendant argues that the testimony can only demonstrate that he had been given Miranda warnings, not that he had waived his rights voluntarily. He argues that the nature of the evidence would not be enough to establish understanding by a normally intelligent person, let alone a person who was borderline mentally retarded.[3] He also contends that the disclosure of the mere fact of the prior incident made him look like a recidivist in the eyes of the jurors.

The Commonwealth argued at trial that the court should admit Trooper Thomas's testimony to show "familiarity with . . . Miranda rights" because defense counsel raised the issue of the defendant's "mental capability." The trial judge decided that the Commonwealth could only "put into evidence the fact that in the course of an investigation, [Trooper Thomas] had an occasion to meet [the defendant] and advise him of his rights, and that [the defendant] then waived his rights and spoke to [Trooper Thomas]. Anything beyond that . . . would be unduly prejudicial." The judge also offered the defendant an opportunity

[2]The defendant was charged in 2001 for the burning of his own motor vehicle. After he gave his statement to Trooper Thomas, he was summoned to court, where he pleaded guilty. He received a suspended sentence of six months and was placed on probation for two years. The underlying incident was not disclosed to the jury by Trooper Thomas.

[3]The Supreme Judicial Court has indicated that, even in the case of a mentally challenged individual, evidence of the prior receipt of Miranda warnings may have some probative value on the question whether the defendant voluntarily waived Miranda rights on a subsequent occasion. See *Commonwealth* v. *Davis*, 380 Mass. 1, 4-6 (1980); *Commonwealth* v. *Prater*, 420 Mass. 569, 579 (1995).

(which he did not take) to submit an instruction that would emphasize the limited relevance of the testimony. Trooper Thomas then testified that he had given Miranda warnings in written form and that the defendant had read and signed the document without asking questions. He did not discuss the nature of the defendant's conduct or the content of the defendant's statement following the waiver.

At trial, the Commonwealth bore the burden of establishing by proof beyond a reasonable doubt that the defendant's waiver of Miranda rights was intelligent, knowing, and voluntary. *Commonwealth* v. *Leahy*, 445 Mass. 481, 484-485 (2005). We consider the totality of the circumstances to determine whether a defendant makes a valid waiver. *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345 (1985). *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). Such circumstances may "include 'promises or inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Commonwealth* v. *Pucillo*, 427 Mass. 108, 110 (1998), quoting from *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

A court may consider a defendant's past experience with law enforcement in determining whether the defendant waived his or her Miranda rights voluntarily. See, e.g., *Commonwealth* v. *Burgess*, 434 Mass. 307, 312 (2001) (referring to defendant's receipt of Miranda warnings three years prior in denying his claim of involuntary waiver by virtue of police coercion); *Commonwealth* v. *Fay*, 14 Mass. App. Ct. 371, 374 (1982) (upholding trial judge's conclusion that defendant had made valid waiver partly because "defendant . . . had previous experience with the Miranda warnings and understood their meaning").

We do not accept the argument that the defendant's limited intelligence restricted the probative value of Trooper Thomas's testimony to the single fact that the defendant had received Miranda warnings in the past. In *Commonwealth* v. *Prater*, 420 Mass. 569 (1995), the defendant argued that he could not have voluntarily waived Miranda rights because of his low IQ and

his level of intoxication. The Supreme Judicial Court noted that "[t]he trial judge carefully considered . . . the defendant's [limited] intelligence . . . in determining that the defendant was capable of understanding the Miranda warnings, especially because this was not the first time he had been subject to a custodial interrogation pursuant to Miranda." *Id.* at 579.[4]

The trial judge in the present case correctly applied the law to the facts, and his conclusion that the testimony was admissible on the issue of the voluntariness of the defendant's waiver was supported by the record. The defendant has a record of steady employment and a demonstrated ability to live independently, even though he has an IQ in the low to mid-seventies, and his formal education included special education classes. He worked at Dunkin' Donuts for about ten years. During his time there, he developed skills in making change and recalling lists of items that were well within the average range for the general population. He has also shown that he can conduct regular financial transactions insofar as he can rent an apartment and make regular payments on electronic equipment. See *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 610 (1984) (defendant could understand and voluntarily waive Miranda rights where, despite a learning disability, he "had reached the tenth grade . . . and he was able to hold down a job"; his "criminal record . . . suggests the fact that [he] was thoroughly schooled in police procedures"); *Commonwealth* v. *King*, 33 Mass. App. Ct. 905, 907 (1992) (rejecting the defendant's claim that limited intelligence prevents a valid waiver because "he had been employed in the past, lived independently, and had had prior contact with the law").

"Whether . . . evidence [is] so inflammatory in nature as to outweigh its probative value and preclude its admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962). Furthermore, "the judge's determination of these questions will be upheld on appeal absent palpable error." *Commonwealth* v. *Marrero*, 427 Mass. 65, 68 (1998), quoting from *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995).

---

[4]In other words, *Prater* appears to recognize that even a person of limited intelligence may be somewhat more likely to understand Miranda warnings if he has been exposed to them previously.

The trial judge's offer to give a jury instruction to emphasize the limited relevance of Trooper Thomas's testimony shows the extent to which he analyzed the prejudicial effect versus the probative value before deciding in favor of admissibility. While the defendant's argument that the testimony "alerted the jury that [the defendant] had been (at the very least) a criminal suspect in the past" is not without merit, the admission of the testimony does not rise to the level of "palpable error" and instead falls within the exercise of "sound discretion."[5] See, e.g., *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

We further note that trial counsel first brought the issue of the defendant's mental capability to the court's attention by eliciting Dr. Pratt's testimony (which preceded Trooper Thomas's). We have previously concluded that "[r]ebuttal is legitimate when it responds to the opponent's case; . . . at any rate, the judge, as the controller of the trial, has a nearly unreversible discretion to allow it." *Commonwealth* v. *Guidry*, 22 Mass. App. Ct. 907, 908 (1986). Because trial counsel introduced the subject of the defendant's ability to understand Miranda warnings, the Commonwealth could elicit Trooper Thomas's testimony in response to demonstrate the defendant's prior experience in waiving Miranda rights.

We therefore conclude that the trial judge did not err in admitting Trooper Thomas's testimony on the issue of the voluntariness of the defendant's waiver of Miranda rights.

2. *Allowance of a jury instruction that police officers give Miranda warnings to persons taken "into custody."* Trial counsel submitted a request for a jury instruction on confessions and admissions to the court that included the sentence: "When the police take a person into custody, they give him certain warnings before any statements he makes in response to interrogation will be admissible in evidence. You have probably heard of them; they are called Miranda warnings." The judge gave the instruction. On appeal, the defendant argues that the instruction proposed by trial counsel and given by the trial judge, together

---

[5]Here, we are persuaded that the judge did not abuse his discretion in admitting the evidence of the prior Miranda warning, particularly in view of the steps he took to avoid undue prejudice and the existence of considerable other evidence tending to show voluntariness.

with Trooper Thomas's testimony, gave rise to a substantial risk of a miscarriage of justice by suggesting to the jury that he had been under arrest when Trooper Thomas gave him Miranda warnings.

We determined in *Commonwealth* v. *Walker*, 68 Mass. App. Ct. 194, 204 (2007), that "[t]he content *and* manner of delivery of jury instructions is ultimately a matter that must be left to the discretion of the trial judge." We find "error . . . by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1982).

"[T]he propriety of a jury instruction" calls for consideration of "the context in which it was delivered, in order that we might determine its probable effect on the jury's understanding of their function." *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 369 (1997). Before he gave the "into custody" part of the instruction, the trial judge told the jury, "You may not consider any [statement made by the defendant to the police] . . . unless from all the evidence in the case, the Commonwealth has proven beyond a reasonable doubt, that the defendant made the statement . . . and, that he made it voluntar[ily], freely, and rationally." He then followed the "into custody" reference with the instruction that the Miranda warnings were relevant "as part of [the jury's] decision as to whether any statement the defendant made was voluntary." Sentence structure and word choice place the focus of the instruction on the voluntariness underlying the defendant's statement to the police, not on his status during his interrogation.

Therefore, the trial judge's decision to submit the instruction to the jury with the "into custody" language requested by the defendant fails to qualify as error. Contrast *Commonwealth* v. *Bowden*, 379 Mass. 472, 482 (1980) (failure of trial judge to give certain jury instructions constituted reversible error).

3. *Ineffective assistance of counsel.* In order to succeed on a claim of ineffective assistance of counsel, a defendant must establish "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer," and deprivation "of an otherwise available, substantial ground of

defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "In reviewing each claim of the ineffectiveness of trial counsel, we consider whether there was an error in the course of the trial and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Scott*, 430 Mass. 351, 356 (1999).

The defendant raises ineffective assistance of counsel on direct appeal. "[T]he preferred route . . . for raising claims of ineffective assistance is not through direct appeal but by a motion in the trial court where facts often necessary to evaluate such claims can be sorted out." *Commonwealth* v. *Zinser*, 446 Mass. 807, 808 n.1 (2006). "The occasions when a court can resolve an ineffective assistance claim on direct appeal are exceptional." *Id.* at 809 n.2. "A claim of ineffective assistance may be resolved on direct appeal of the defendant's conviction when the factual basis of the claim appears indisputably on the trial record." *Commonwealth* v. *Anderson*, 58 Mass. App. Ct. 117, 124, cert. denied, 540 U.S. 1009 (2003). Trial records often do not contain the bases for the strategies employed by the parties, and therefore, appellate courts will only consider claims of ineffective assistance of counsel raised on direct appeal when "an attorney's tactical decision . . . was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). Accordingly, we generally do not second-guess "arguably reasoned tactical or strategic judgments." *Commonwealth* v. *DeLong*, 60 Mass. App. Ct. 122, 131 (2003), quoting from *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979).

Two of the three claims that the defendant raises on appeal in relation to ineffective assistance of counsel are about jury instructions. First, he argues that trial counsel should have requested the limiting instruction recommended by the judge in response to Trooper Thomas's testimony, especially after the Commonwealth stated in closing argument, "let's not forget that this is a defendant who has seen a Miranda form before." Second, he contends that trial counsel should have acted to remove the "into custody" language from the jury instruction on waivers of Miranda rights. The defendant specifically claims that trial counsel's failure to act affirmatively to limit the prejudicial effect of Trooper Thomas's testimony and the "into custody"

language of the jury instruction on Miranda warnings caused irreparable harm to his case.

The third ineffective assistance claim raised by the defendant involves Dr. Pratt's testimony. During direct examination, trial counsel asked, "In response to my request, what did you do in regards to this case?" She answered with the list of sources upon which she relied in forming her professional opinion of the defendant's ability to waive Miranda rights voluntarily. Among the documents she reviewed were "reports concerning a fire at [the defendant's] home on Cherry Street" and "a CORI[6] record for [the defendant]." The defendant argues on appeal that trial counsel erred in eliciting Dr. Pratt's testimony because it consisted of evidence of prior bad acts that led jurors to infer that the defendant was a serial arsonist.

We decline to address his claims because he did not raise them through a motion for a new trial, and the record of the direct appeal is insufficient to show the purported ineffective assistance of counsel. See *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. 106, 108 (1999) (rejecting defendant's claim because "the record [did] not offer a sufficiently full portrayal of the various issues necessarily subsumed in . . . an [ineffective assistance of counsel] analysis"). Trial counsel's decisions not to act on certain jury instructions or potentially prejudicial testimony could have been reasonable trial strategy.[7] See *Commonwealth* v. *Gomes*, 443 Mass. 502, 507 (2005) (determining that failure to object was not "manifestly unreasonable" when "objection could have resulted in emphasizing the testimony"). "[A] motion for a new trial accompanied by affidavits, with the potential for an evidentiary hearing and findings," is the "recommended course" to determine whether trial counsel's strategy was reasonable. *Commonwealth* v. *McCormick*, 48 Mass. App. Ct. at 107.

*Judgment affirmed.*

---

[6]Criminal offender record information.

[7]We express no opinion whether Dr. Pratt's reference to the CORI record and the earlier fire qualify as admissible evidence of other bad acts. It may be proper to admit "evidence of other bad acts when that evidence relates to a subsidiary issue . . . and is not offered to prove his guilt but rather to prove a relevant subsidiary fact." *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985).