616 P.2d 865 (1980)
In the Matter of J.R., a minor child, Appellant,
v.
STATE of Alaska, Appellee.
No. 5194.
Supreme Court of Alaska.
September 19, 1980.
*866 Mark A. Weaver, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant.
Eugene P. Murphy, Asst. Dist. Atty., Larry R. Weeks, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.
Before RABINOWITZ, C.J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

OPINION
RABINOWITZ, Chief Justice.
J.R., a seventeen-year-old male accused of murdering and robbing two Anchorage taxicab drivers in December 1979, has appealed a decision of the superior court finding him unamenable to treatment as a juvenile and waiving the jurisdiction of the juvenile court pursuant to AS 47.10.060. We affirmed the superior court's waiver decision by an order which indicated that an opinion would follow.
J.R. has an extensive juvenile record. His first contact with the juvenile justice system occurred when he was eleven and was apprehended for joyriding. Before his thirteenth birthday, and while on runaway status, J.R. held up a nurse in Palmer at gunpoint. He was committed to the custody of Health and Social Services, which assigned him to the McLaughlin Youth Center. After that he was eventually placed in Alcantra Youth Camp. Shortly after his assignment at Alcantra, however, J.R. ran away from the camp. He was therefore reassigned to the Turning Point Boys' Ranch in Willow. After one year his progress was poor, so the placement was continued. J.R. was released from Turning Point in May 1977 to the custody of his father, who was then living in the Lake Clark area.[1]
In October of the same year, J.R. broke into the Tourist Information Center in Palmer. This burglary took place only two weeks after he had returned to Palmer from Lake Clark. After another of his frequent stays at the McLaughlin Youth Center in Anchorage, he was released to foster parents. He fled almost immediately, and was not apprehended until three weeks later. In January 1978, he was again placed in McLaughlin where he remained until his October 1979 release to the Y.A.A.C. work program at Elmendorf Air Force Base. The murders and robberies at issue took place slightly two months after J.R.'s release from McLaughlin Youth Center.
J.R.'s family history is a turbulent one. He has three older brothers, two of whom have had a history of juvenile offenses. His parents were married in 1956, but divorced in 1969 because of his mother's drinking problem. His father apparently has married at least twice since then, and his mother remarried in 1975. J.R. believes that he is unable to get along with his father and has done little to try to arrange living with his mother, although he has said he would like to live with her.[2] A January 1979 review of J.R. by a McLaughlin youth counselor noted that he had "mixed feelings" toward his parents and believed they had rejected him.
Every person who has evaluated J.R. since his initial contact with the juvenile system in 1975 has found him to be a troubled child with an inability to adjust well to *867 his surroundings. At the waiver hearing, the superior court heard testimony from Jay Warner, the juvenile intake officer of the trial courts in the third judicial district, and from J.R.'s long-time former probation officer in Palmer, Wayne Pinquoch. Warner testified that J.R. never functioned well outside of an institution, and had undergone no "rehabilitative improvement" during his years in the juvenile system. He believed that J.R. was not treatable under the juvenile system. Pinquoch also testified that he saw J.R. only "change in surface conformity," and that he saw no indepth changes in J.R. during his juvenile treatment. In addition, Pinquoch testified that he believed J.R. was not amenable to rehabilitation within the juvenile system.
J.R. contends that the evidence presented at the waiver hearing is insufficient to support the superior court's waiver of jurisdiction in that it does not fulfill the conditions set forth in AS 47.10.060(d) and the guidelines established in previous decisions of this court. More particularly, J.R. asserts that the superior court could not legally make a decision on waiving jurisdiction because of the absence of any "thorough investigation of available treatment programs, and professional evaluation of his background and psychiatric and psychological condition relative to potential treatment alternatives." J.R. bases his argument on language construing AS 47.10.060(d)[3] found in several of this court's earlier cases. He relies most heavily on our statement in P.H. v. State, 504 P.2d 837, 845-46 (Alaska 1972), that the amenability decision must be predicated on a "full inquiry" into the issue, with a "thorough examination of the child, his background and alternative strategies of rehabilitation short of adult criminal treatment." He also cites language from several cases concerning psychiatric examinations of youth. Thus, in D.H. v. State, 561 P.2d 294, 299 n. 12 (Alaska 1977), in remanding for a more complete waiver hearing, we said that the juvenile court "may consider the desirability of a psychiatric examination of D.H." In In re J.H.B., 578 P.2d 146, 149 (Alaska 1978), we observed that the juvenile court had heard "extensive testimony from a psychiatrist." In In re. F.S., 586 P.2d 607, 614 n. 26 (Alaska 1978), we noted that the opinions of six psychiatrists and psychologists were part of the evidence.
However, none of the cases cited by J.R. compel the conclusion that a waiver decision cannot be made without the testimony of a psychologist or psychiatrist, and we decline to adopt such a rule. Such testimony is germane to at most two of the four factors set out in AS 47.10.060(d), and not all four of those factors need be determined adversely to the youth to warrant waiver of juvenile jurisdiction. P.H. v. State, 504 P.2d 837, 845 (Alaska 1972). Indeed, in In re F.S., 586 P.2d 607, 615 (Alaska 1978), we reversed the juvenile court's refusal to waive jurisdiction, notwithstanding extensive psychiatric testimony that F.S. was amenable to treatment as to juvenile.
Here there was evidence before the superior court sufficient to satisfy the "full inquiry" standard of P.H. v. State. Both of the juvenile officers who testified at the waiver hearing had many years of experience and had had frequent contacts with J.R. over a period of several years. It is true that it appears that Warner had had no significant communication with J.R. in the few months preceding the murders, and that Pinquoch had not spoken with him since January 1979 at the latest. However, both men had knowledge of the current allegations against J.R.,[4] and could add this *868 knowledge to their earlier evaluations of J.R. to enable them to assess reliably J.R.'s amenability to treatment as of the date of the waiver hearing.
The decision of the superior court is AFFIRMED.[5]
BOOCHEVER, J., not participating.
NOTES
[1] J.R.'s probation officer, who moved for J.R.'s release from Turning Point, stated that he did so not because J.R. had successfully completed the program, but because he believed J.R. had been at Turning Point long enough.
[2] J.R.'s former probation officer did not believe that J.R. really wanted to live with his mother, but was "grasping at straws in order to stay out of an institution."
[3] AS 47.10.060(d) reads:

A minor is unamenable to treatment under this chapter if he probably cannot be rehabilitated by treatment under this chapter before he reaches 20 years of age. In determining whether a minor is unamenable to treatment, the court may consider the seriousness of the offense the minor is alleged to have committed, the minor's history of delinquency, the probable cause of the minor's delinquent behavior, and the facilities available to the division of youth and adult authority for treating the minor.
[4] An affidavit of Alaska State Trooper Investigator Thomas Stearns accompanied the state's request for a waiver of juvenile jurisdiction and stated that J.R. had admitted participation in both murders.
[5] J.R. does not argue that the superior court abused its discretion in waiving juvenile jurisdiction based on the evidence going to the seriousness of the offenses the minor committed or the minor's history of delinquency. Given his extensive juvenile record and the gravity of the offenses with which he is charged, our decision in In re F.S., 586 P.2d 607 (Alaska 1978), would preclude a successful appeal on these grounds. In In re F.S., this court held that the superior court abused its discretion in not waiving jurisdiction over F.S., charged with the murder of a nine-year-old girl during a sexual assault on her. Id. at 615. F.S., like J.R., was seventeen at the time of the offense, both cases involved murders, and F.S., again like J.R., had an extensive number of prior juvenile offenses.