777 P.2d 204 (1989)
R.H., A Minor, Appellant,
v.
STATE of Alaska, Appellee.
No. 942.
Court of Appeals of Alaska.
July 7, 1989.
Nelson Traverso, Asst. Public Advocate, Fairbanks, and Brant McGee, Public Advocate, Anchorage, for appellant.
Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.
Before BRYNER, C.J., and COATS and SINGLETON, JJ.

*205 OPINION
BRYNER, Chief Judge.
R.H. appeals from an order entered by Superior Court Judge Jay Hodges waiving children's court jurisdiction and directing that R.H. be tried by the superior court as an adult for murder in the first degree, robbery in the first degree, and other related charges. R.H. contends that the court violated his privilege against self-incrimination and his right to counsel by compelling him to submit to a psychiatric evaluation in order to determine his amenability to treatment as a minor. R.H. additionally contends that the court erred in finding him unamenable to treatment and in failing to find that the state proceeded in bad faith in supervising him on juvenile probation. We find that the court erred in compelling R.H. to submit to a psychiatric evaluation.
The facts are undisputed. On the night of March 31, 1988, R.H. and another minor, P.K.M., burglarized a Fairbanks office and stole a pistol, the owner's manual to the pistol, some ammunition, and an extra clip. By reading the owner's manual, R.H. and P.K.M. learned how to operate the gun. They then decided to rob a taxicab driver in order to obtain money for drugs; the boys made plans to kill the driver of the cab.
In the early morning hours of April 1, R.H. and P.K.M. flagged down a cab driven by Dale Baurick and asked to be taken to McGrath road in Fairbanks. Baurick drove the boys there and stopped the cab. R.H., who was seated behind Baurick, fired four shots into Baurick's back. As R.H. fired the shots, Baurick threw a wad of money into the back seat.
*206 After firing the shots, R.H. searched Baurick's pockets, taking a knife from one of them. R.H. then pulled Baurick out of the cab onto the road. Baurick apparently moaned. P.K.M. told R.H. to shoot Baurick, to make sure that he died. R.H. fired another shot into Baurick's head as Baurick lay on the road. R.H. and P.K.M. left the scene, driving Baurick's cab.
Alaska State Troopers investigating the case interviewed R.H. two days later, on April 3, 1988. R.H. gave a videotaped statement confessing to the murder and to the prior burglary in which he stole the murder weapon. The state thereafter petitioned for waiver of children's court jurisdiction over R.H., charging him with murder in the first degree, robbery in the first degree, and other offenses stemming from the burglary and shooting of March 31 and April 1.
R.H. was born on May 22, 1971. At the time of the offenses in this case, he was less than two months away from his seventeenth birthday. R.H.'s parents were divorced in 1979. R.H. first became involved in delinquent behavior in 1977, when he was charged with destroying mail from mailboxes. In 1983, at age twelve, R.H. was charged with harassment and disorderly conduct. The following year, he was involved in a shoplifting.
The 1983 and 1984 offenses apparently occurred when R.H. was living with his mother. In 1985, while living with his father in Delaware, R.H. was charged with possession of marijuana. Later in 1985, after turning fourteen, R.H. was charged with robbery and conspiracy. In early 1986, while awaiting disposition on the robbery charge, R.H. was charged with consuming alcohol, criminal trespass, and criminal misrepresentation. In an apparent effort to avoid Delaware delinquency proceedings, R.H.'s father sent R.H. to live with relatives in California.
Within a short time, in April of 1986, R.H. robbed a woman in California. R.H.'s father evidently misled California authorities, telling them that, for the most part, R.H. had never been in trouble with the law. R.H. was eventually released on probation on condition that he not return to California without being accompanied by a parent.
From California, R.H. was sent to live with his mother in North Pole, Alaska. In March of 1987, while fifteen years old, R.H., in the company of two adults, broke into Moose Creek Lodge and stole alcohol, food, money, and stereo equipment. At sixteen years of age, in August of 1987, R.H. was stopped while driving a stolen pickup truck. An Intoximeter test indicated a breath alcohol level of .08.
The state filed a delinquency petition charging R.H. with burglary, theft, criminal mischief, and consumption of alcohol. On December 4, 1987, R.H. admitted the allegations of the petition. The superior court released him to the custody of his mother pending a disposition hearing. Six days later, R.H. was arrested for shoplifting. Upon arrest, he appeared to have been drinking; a pipe containing marijuana residue was found on his person.
A disposition hearing was held in superior court in Fairbanks on January 12, 1988. R.H. was placed on probation, on condition that he remain in the custody of his mother, participate in a substance abuse counseling program, and refrain from consuming alcohol or controlled substances.
On March 30, 1988, R.H.'s mother reported to R.H.'s juvenile probation officer that R.H. had stolen $4,000 worth of coins from her boyfriend and had sold them. Less than two days later, R.H. engaged in the fatal shooting of Dale Baurick.
Following R.H.'s arrest for the shooting, the state filed a petition for waiver of children's court jurisdiction, pursuant to AS 47.10.060(a). In support of its petition, the state requested a psychiatric evaluation of R.H., arguing that expert testimony concerning R.H.'s psychological condition would be relevant in determining his amenability to treatment. R.H. opposed the state's motion, arguing that a court order requiring him to submit to a psychiatric evaluation would violate his privilege against self-incrimination. R.H. pointed out that he had not affirmatively raised *207 any issue pertaining to his psychological condition.
After hearing argument on the state's motion, Superior Court Judge Jay Hodges ordered R.H. to submit to psychiatric evaluation and substance abuse screening. In ordering the examinations, Judge Hodges took elaborate precautions to safeguard R.H.'s privilege against self-incrimination and his right to counsel. The Judge directed that R.H.'s attorney have the right to be present with R.H. during the examinations. Additionally, Judge Hodges ordered that R.H.'s examiners be precluded from discussing their findings with the state, and he directed that their written reports be submitted to the court under seal for an initial screening by R.H.'s counsel. R.H.'s counsel was to be given an opportunity to raise self-incrimination objections to any specific information in the reports dealing with the facts of the case. Defense objections were to be ruled upon by a judge other than the judge presiding over the waiver hearings. By this process, a "sanitized" report was to be generated for disclosure to the court and the state for use in the waiver proceedings. No further use of the report, beyond the waiver stage, was to be allowed.
While preserving his original objections, R.H. submitted to the court-ordered examination; he was evaluated by a psychologist and two psychiatrists. All three examiners prepared written reports, which were eventually presented to the court and to the state in sanitized form.
A waiver hearing was subsequently held to determine R.H.'s amenability to treatment, pursuant to AS 47.10.060(a) and (d), which provide:

Waiver of Jurisdiction. (a) If the court finds at a hearing on a petition that there is probable cause for believing that a minor is delinquent and finds that the minor is not amenable to treatment under this chapter, it shall order the case closed. After a case is closed under this subsection, the minor may be prosecuted as an adult.
... .
(d) A minor is unamenable to treatment under this chapter if the minor probably cannot be rehabilitated by treatment under this chapter before reaching twenty years of age. In determining whether a minor is unamenable to treatment, the court may consider the seriousness of the offense the minor is alleged to have committed, the minor's history of delinquency, the probable cause of the minor's delinquent behavior, and the facilities available to the division of youth and adult authority for treating the minor.
R.H.'s waiver hearing was conducted in two stages. The initial stage focused on whether, under AS 47.10.060(a), there was probable cause to believe that R.H. had committed the delinquent acts alleged. At this hearing, R.H. conceded that the state had probable cause to establish that he had committed the alleged misconduct. R.H. likewise conceded the seriousness of the offenses, a factor specified in AS 47.10.060(d) as bearing on the issue of amenability to treatment.
The second stage of the waiver proceedings focused on the remaining aspects of R.H.'s amenability to treatment under AS 47.10.060(d). R.H. did not dispute his history of delinquency. To establish the probable cause for R.H.'s delinquent behavior and the adequacy of existing facilities to provide treatment to R.H., the state presented, inter alia, testimony from the three experts who had examined R.H. pursuant to the court's order. The upshot of the expert testimony was that R.H. suffered from a serious conduct disorder, that he exhibited traits commonly associated with adults suffering from antisocial personalities, that there were no facilities capable of providing him with treatment, and that he was not amenable to rehabilitation as a child.
Upon conclusion of the waiver hearings, Judge Hodges issued a written order waiving jurisdiction over R.H.'s case. The order found probable cause to believe that R.H. had committed the alleged offenses. With respect to the seriousness of the offenses, Judge Hodges found that first-degree *208 murder was the most serious of crimes and that R.H.'s offense qualified among the most serious of first-degree murders. Judge Hodges additionally found that R.H.'s history of delinquency was extensive and would in itself have supported the conclusion that R.H. was not amenable to treatment as a child. Concerning the probable cause for R.H.'s delinquent behavior, the judge found that R.H.'s delinquent problems apparently grew out of his dysfunctional home life and his addiction to drugs; the judge also found that R.H. had become self-indulgent and narcissistic and had developed the characteristics of an antisocial personality. Finally, Judge Hodges found that there was no available juvenile facility capable of addressing R.H.'s psychological or substance abuse problems. Based on these findings, Judge Hodges concluded that R.H. was not amenable to treatment by his twentieth birthday and directed that he be tried as an adult.
On appeal, the primary contention raised by R.H. is that the superior court erred in compelling him to submit to psychiatric evaluations. R.H. claims that the court-ordered evaluations infringed his right to be free from compelled self-incrimination, as guaranteed by the fifth amendment to the United States Constitution and article 1, section 9, of the Alaska Constitution.[1]
In response to R.H.'s claim, the state argues that the superior court took adequate steps to protect R.H.'s privilege against self-incrimination. The state maintains that the fact that the court restricted the use of the evaluations to the determination of R.H.'s amenability to treatment and precluded their use in subsequent phases of his case satisfied the requirements of the constitution.
In our view, the propriety of the superior court's order compelling R.H. to submit to psychiatric evaluation hinges upon the validity of either of two alternative rationales  one apparently adopted by the trial court, and the other espoused by the state on appeal. The first is Judge Hodges' tacit assumption that the privilege against self-incrimination covers only directly inculpatory statements and that, consequently, R.H.'s rights could therefore be protected by adopting safeguards to assure that no directly inculpatory statements would be divulged to the prosecution or to the court at any stage of the proceedings. The second is the state's belief that the privilege simply does not attach in a juvenile waiver proceeding to the determination of amenability to treatment. The state contends that the issue of amenability to treatment does not entail the adjudication of guilt but involves only a selection of the forum in which R.H.'s case will be handled. Thus, according to the state, R.H.'s fifth amendment rights would have been adequately protected by providing R.H. with immunity against disclosure of his statements at any stage of proceeding after the waiver hearing. In the state's view, the precautions that the court took to prevent disclosure of directly incriminating statements at the waiver hearing stage were simply unnecessary.
We conclude, however, that reliance on either or both of these rationales is foreclosed by the United States Supreme Court's decision in Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In that case, the defendant, Smith, was charged with murder. The trial court issued a sua sponte order directing that Smith be examined by a psychiatrist in order to determine his competency to stand trial. Pursuant to the order, a psychiatrist visited Smith in jail and conducted a brief examination. Smith was not informed of his right to remain silent, and his attorney was not notified of the examination.
Smith was found to be competent and was eventually tried and convicted by a jury. At his sentencing hearing, the prosecution *209 was allowed, over defense objection, to call the psychiatrist who had examined Smith prior to trial. Based on his examination, the psychiatrist expressed the view that Smith was an antisocial personality, and he predicted that Smith would continue to present a danger to the community. Relying on this testimony, the jury recommended the death sentence in Smith's case.
The Supreme Court held that, because Smith had not been advised of his right to remain silent before being subjected to the court-ordered psychiatric examination, use of the expert testimony during Smith's sentencing hearing was impermissible. Although the court emphasized that no constitutional problem would have been raised had the court-ordered psychiatric evaluation been used solely for the purpose of determining Smith's competency to proceed prior to trial, the court concluded that reliance on the evidence in the penalty phase of Smith's case resulted in a violation of his fifth amendment privilege against self-incrimination.
In reaching this conclusion, the Supreme Court made it clear that the fifth amendment privilege is not confined to directly inculpatory statements or to any particular type of proceeding.
The Fifth Amendment ... commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The essence of this basic constitutional principle is "the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips."
The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." In this case, the ultimate penalty of death was a potential consequence of what [Smith] told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made "`the deluded instrument of his own conviction,'" it protects him as well from being made the "deluded instrument" of his own execution.
We can discern no basis to distinguish between the guilt and penalty phases of [Smith's] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned... . Any effort by the state to compel [Smith] to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish [Smith's] future dangerousness by relying on the unwarned statements he made to [the examining psychiatrist] similarly infringes Fifth Amendment values.
Estelle v. Smith, 451 U.S. at 462-63, 101 S.Ct. at 1872-73 (citations and footnotes omitted).
In the present case, as in Estelle v. Smith, the prosecution was allowed to use a court-ordered psychiatric evaluation against the accused by relying on the evaluation to establish future dangerousness. The only significant distinction between the two cases is that Smith's statements to his examiner were used to influence the outcome of his sentencing hearing; R.H.'s statements to his examiner were used to influence the result of his waiver hearing.
The state contends that this distinction is crucial. Emphasizing Estelle v. Smith's conclusion that no fifth amendment violation occurs when a court-compelled psychiatric evaluation is used for the limited purpose of determining an accused's competency for trial, the state likens the determination of amenability to treatment in a juvenile waiver proceeding to the determination of competency in a criminal case:
Like the issue of competency to stand trial, the issue of a minor's unamenability to treatment does not go to the issue of guilt. Rather, the probable success or failure of juvenile treatment in the years remaining before the minor turns twenty is an issue which affects only the forum where the issue of guilt will be adjudicated.
*210 We find the state's argument unpersuasive, for there are vast and fundamental differences between competency proceedings and juvenile waiver hearings. In holding that court-ordered psychiatric examinations are permissible for purposes of determining competency to proceed, the Court in Estelle v. Smith characterized such examinations as being conducted for "limited, neutral purposes." 451 U.S. at 465, 101 S.Ct. at 1874. The Court distinguished the use of examinations for such purposes from their use in an "adversary system," by persons who are not "acting solely in [the] interest" of the accused. 451 U.S. at 467, 101 S.Ct. at 1875.
In contrast to competency proceedings, juvenile waiver hearings are hardly "neutral proceedings." Rather, they are fully adversary proceedings in which the burden of establishing a child's probable unamenability to treatment is formally allocated to the state. Similarly, a psychiatrist conducting an examination at the request of the state for use in such cases is hardly a person "acting solely in the interest" of the child. To the contrary, the psychiatrist is directly involved in furthering the interests of the child's formal adversary.
Nor can juvenile waiver proceedings realistically be said to affect "only the forum where the issue of guilt will be adjudicated." A juvenile waiver proceeding is the only available avenue by which the state may seek to prosecute a child as an adult. Consequently, the stakes involved in such proceedings are high:
The result of a fitness hearing is not a final adjudication of guilt; but the certification of a juvenile offender to an adult court has been accurately characterized as "the worst punishment the juvenile system is empowered to inflict."
Ramona R. v. Superior Court, 37 Cal.3d 802, 210 Cal. Rptr. 204, 693 P.2d 789, 795 (1985) (citation omitted).
In W.M.F. v. State, 723 P.2d 1298, 1300 (Alaska App. 1986), we recognized that the accused child's interest in the outcome of a juvenile waiver proceeding is important, because the waiver hearing can mean the difference between a limited period of confinement and a lengthy term of imprisonment. For example, if R.H. were prosecuted as a child, he would face approximately three years of confinement in the relatively benign and treatment-oriented setting of a juvenile detention facility. If prosecuted as an adult and convicted of first-degree murder, he would face a maximum term of ninety-nine years in a penitentiary, and a mandatory minimum sentence of twenty years' imprisonment.
Just as the psychiatric evaluation in Estelle v. Smith enabled the prosecution to incriminate Smith by using his own statements to his disadvantage at sentencing, the court-compelled evaluations in the present case enabled the state to incriminate R.H. Admission of the psychiatric evidence against R.H. at the waiver hearing helped to pave the way for the state to prosecute R.H. as an adult, thereby exposing him to potential punishment far more severe than could otherwise have been visited upon him. The state's reliance at the waiver hearing on the court-compelled evaluations was "plainly adverse" to R.H. Estelle v. Smith, 451 U.S. at 465, 101 S.Ct. at 1874. In a very real sense, R.H. was made the "deluded instrument" of his own criminal prosecution. 451 U.S. at 462, 101 S.Ct. at 1873; Culombe v. Connecticut, 367 U.S. 568, 581, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961).[2]
*211 The state expresses concern that a prohibition against court-compelled psychiatric evaluations would adversely impact the superior court's ability to reach an informed decision on the issue of amenability to treatment. A virtually identical argument, however, was squarely rejected by the United States Supreme Court in Estelle v. Smith, 451 U.S. at 472-73, 101 S.Ct. at 1877-78.
The argument is no more persuasive in the context of the present case than it was in Estelle v. Smith. Although the Alaska Supreme Court has noted the possible desirability of psychiatric examinations in waiver proceedings, see D.H. v. State, 561 P.2d 294, 299 n. 12 (Alaska 1977), modified on other grounds, Matter of F.S., 586 P.2d 607 (Alaska 1978), it has never suggested that an examination may be conducted against the wishes of a child, nor has it held that expert testimony is a necessary precondition of waiver. To the contrary, the Alaska Supreme Court has expressly recognized that the state need not present any psychiatric evidence to meet its burden of proving that a child is unamenable to treatment. See, e.g., J.R. v. State, 616 P.2d 865, 867 (Alaska 1980). Moreover, there appears to be good reason for caution to protect against excessive reliance on such evidence. As noted by the United States Supreme Court in Estelle v. Smith:
Indeed, some in the psychiatric community are of the view that clinical predictions as to whether a person would or would not commit violent acts in the future are "fundamentally of very low reliability" and that psychiatrists possess no special qualifications for making such forecasts.
Estelle v. Smith, 451 U.S. at 472, 101 S.Ct. at 1878 (citations omitted).
As we have already observed, a juvenile waiver hearing is not a neutral and benevolent process designed for the protection of children. Instead, children are presumptively protected against criminal prosecution. Juvenile waiver has been established as the adversary process through which the state may override that presumption. The legislature has placed the burden of proof squarely on the state. By filing a petition seeking waiver, the state formally alleges that it can meet its statutory burden and that it has the proof to support its claims. In some situations, the lack of information concerning the psychiatric condition of the accused child will undoubtedly make the state's burden more difficult to meet. Nevertheless, the state's interest in lightening its burden can hardly be viewed as justification for subverting the established burden of proof or for infringing the basic and constitutionally protected privilege against self-incrimination. Accordingly, we conclude that the superior court erred in compelling R.H. to submit to a psychiatric evaluation for the purpose of determining his amenability to treatment as a child.
We emphasize, however, that the same conclusion would not be warranted had R.H. sought to present psychiatric evidence in his own behalf at the waiver hearing or had he otherwise affirmatively placed his mental condition in issue. It is well established that, under those circumstances, the superior court could have properly found that R.H. waived his fifth amendment privilege, and that the state was entitled to an *212 independent psychiatric evaluation for its own use. See, e.g., Estelle v. Smith, 451 U.S. at 465-66, 101 S.Ct. at 1874-75; Schade v. State, 512 P.2d 907 (Alaska 1973). See also United States v. Halbert, 712 F.2d 388, 389-90 (9th Cir.1983); State v. Nuss, 52 Wash. App. 735, 763 P.2d 1249, 1251-53 (1988). In the present case, it is sufficient to note that R.H. did not obtain a psychiatric evaluation for his own use in the waiver proceedings, and he disavowed any intent to affirmatively place his own mental condition in issue.
We must next consider whether the superior court's erroneous reliance on the challenged psychiatric evidence amounted to harmless error. The state argues that any error is rendered harmless because waiver would clearly have been appropriate in view of the seriousness of R.H.'s offense and in view of R.H.'s extensive history of delinquency. There is considerable merit to the state's argument.
In its written findings, the superior court expressly indicated that waiver of children's court jurisdiction over R.H. was justified without reference to the disputed psychiatric evidence. After considering the factual circumstances surrounding R.H.'s delinquent behavior and R.H.'s extensive record of delinquency, Judge Hodges concluded: "Based on [R.H.'s] prior criminal history of delinquency alone the court can find that he should be waived." The superior court's conclusion finds strong support in the record.
The state presented evidence establishing probable cause to believe that R.H. committed a first-degree murder by repeatedly shooting an innocent victim at point blank range. The killing was planned and appears to have been motivated only by R.H.'s desire to obtain money for drugs. As stated by the superior court: "The murder was either a result of extreme unexplained and unprovoked violence or was deliberate and premeditated."
In addition to the seriousness of R.H.'s crime, the superior court properly considered that R.H. was only two months away from his seventeenth birthday at the time of the offense; consequently, only three years of treatment could be provided for R.H. in the juvenile system. In conjunction with R.H.'s age and the seriousness of his crime, the court also properly considered his lengthy history of delinquent behavior and the fact that he was on juvenile probation when he committed the current offense. Finally, the court properly took note of R.H.'s lengthy history of substance abuse.
The evidence relating to the circumstances surrounding the offense and to R.H.'s history of delinquent behavior would certainly be sufficient, standing alone, to support the superior court's decision to waive children's court jurisdiction. In fact, this evidence may be far more compelling than the predictions expressed by the expert witnesses. As we have noted in prior cases, an offender's past conduct can be a more reliable indicator of future behavior than psychological prognostication. See, e.g., Skrepich v. State, 740 P.2d 950, 954 (Alaska App. 1987); Maal v. State, 670 P.2d 708, 711-12 (Alaska App. 1983).
This court has consistently upheld superior court orders waiving juvenile jurisdiction in cases of murder involving extreme and unprovoked violence. In such cases, even when a child's amenability to treatment has been supported by strong psychiatric evidence, we have been reluctant to reverse a trial court's determination that waiver is appropriate. See, e.g., W.M.F. v. State, 723 P.2d 1298, 1304-05 (Alaska App. 1986) (affirming waiver of jurisdiction over a fifteen-year-old girl); C.G.C. v. State, 702 P.2d 648 (Alaska App. 1985) (affirming waiver of jurisdiction over a fourteen-year-old boy whose amenability to treatment was supported by the testimony of a psychiatrist at the waiver hearing). In one case of extreme, unprovoked violence, the Alaska Supreme Court has actually reversed a trial court order declining to waive jurisdiction, despite the presence of abundant psychiatric testimony indicating that the child was capable of being rehabilitated. See Matter of F.S., 586 P.2d 607, 613-15 (Alaska 1978), overruled on other grounds, State v. F.L.A., 608 P.2d 12 (Alaska 1980). These cases indicate that, *213 apart from the disputed psychiatric testimony, the evidence in this case was fully sufficient to justify the superior court's waiver order.
Nevertheless, the challenged psychiatric evidence was given considerable prominence by the parties below and played a significant part in the superior court's written findings and conclusions. It is impossible for us to say that the erroneously admitted evidence did not have an appreciable effect on the court's ultimate decision to waive jurisdiction. Moreover, it would be a relatively simple task for the superior court to reconsider its original decision based on the evidence that was properly presented, and disregarding the improperly admitted psychiatric testimony and reports. These considerations persuade us that the interest of justice will be best served by rejecting the state's invitation to find harmless error and by remanding this case for reconsideration.
Upon remand, although the court should allow the parties an opportunity to argue their cases, it need not receive new evidence and may base its decision upon a reevaluation of the previously presented evidence that remains after deletion of the evidence stemming from R.H.'s psychiatric evaluation.
The superior court's order waiving jurisdiction is VACATED, and this case is REMANDED for reconsideration in conformity with this opinion.[3]
NOTES
[1] R.H. separately argues that the court-ordered psychiatric evaluations deprived him of his constitutional right to counsel, as provided for in the sixth amendment to the United States Constitution and article 1, section 11, of the Alaska Constitution. To the extent that this argument is not derived from R.H.'s self-incrimination claim, it is without merit; the superior court expressly ordered that R.H.'s counsel be permitted to accompany R.H. and to consult with him throughout the course of the psychiatric evaluations.
[2] In support of its argument, the state has cited Matter of Appeal in Pima County, Juvenile Action, 139 Ariz. 446, 679 P.2d 92 (App. 1984). There, a child was ordered to undergo psychiatric evaluation for the purpose of determining amenability to treatment in a children's waiver proceeding. On advise of counsel, the child declined to be examined, and his refusal was subsequently considered by the trial court in deciding to waive children's court jurisdiction. The Arizona Court of Appeals reversed, finding Estelle v. Smith to be applicable. The court concluded that the trial court's failure to make it clear in advance that the psychiatric evidence would not be used in any subsequent prosecution or sentencing hearing resulted in a violation of the fifth amendment. The court went on to express the view that, had provision been made for immunity from use at trial or sentencing, the use of the court-ordered evaluation at the waiver hearing would have been proper. This issue, however, was not directly presented on appeal and does not appear to have been argued in the Arizona case. Arizona court rules expressly authorized court-ordered psychiatric evaluations in waiver proceedings. See Pima County, 679 P.2d at 93. It appears that the court of appeals was concerned with emphasizing that its decision did not affect the validity of the rule. In reaching its conclusion, the court apparently tacitly assumed that a waiver proceeding could be likened to a hearing on the issue of competency to proceed. The court made no effort to explain or justify its conclusion. Given these circumstances, although the decision in Pima County does support the state's argument in the present case, we do not find that decision persuasive.

The state has also cited Ramona R. v. Superior Court, 210 Cal. Rptr. 204, 693 P.2d 789, to support its argument. Ramona R., however, is inapposite. In that case, the California Supreme Court held only that use immunity was both necessary and sufficient to protect the fifth amendment interests of a child who desired to present psychiatric evidence in her own behalf at a waiver hearing but who was reluctant to undergo an evaluation because of possible use of the evaluation in subsequent criminal proceedings. Nothing in Ramona R. establishes the adequacy of use immunity in the context of an involuntary psychiatric evaluation.
[3] R.H. has raised two additional issues that require only brief consideration.

First, R.H. argues that the court abused its discretion in failing to allow an extended period of treatment and observation in order to assist in predicting his amenability to treatment as a child. It is certainly true that a substantial period of preliminary treatment and observation would result in a more accurate prediction of amenability in many waiver cases. Indeed, a definitive conclusion on the issue of amenability could be achieved by routinely postponing the decision on waiver until the accused child's twentieth birthday. However, the established procedure for waiver of children's court jurisdiction clearly contemplates a hearing that is roughly contemporaneous with the filing of the waiver petition and that is based on the best evidence then available. The prediction of a child's amenability to treatment inevitably involves an element of uncertainty. Yet protracted delays in waiver proceedings would be injurious to the interests of the state and the child alike. W.M.F. v. State, 723 P.2d at 1302. Absent unusual, case-specific circumstances precluding a meaningful determination of amenability to treatment, the superior court is under no obligation to order  and an accused child has no right to receive  a protracted period of prehearing treatment and observation. Id. We find no error in the superior court's failure to postpone the waiver decision in the present case.
R.H.'s remaining claim is that the state failed to provide him with adequate supervision or rehabilitation while he was on probation prior to committing the current offenses. R.H. maintains that the state should in effect be estopped from prosecuting him as an adult because it acted in bad faith in failing to supervise him. R.H. cites no authority for this proposition. Even assuming that R.H.'s factual assertions are well founded, we find no legal merit to his estoppel argument.