Michael B. LOONEY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3783.

Court of Appeals of Alaska.

Feb. 28, 1992.

Valerie Leonard, Leslie A. Hiebert, Asst. Public Advocates, and Brant G. McGee, Public Advocate, Anchorage, for appellant.

John J. Novak, Asst. Dist. Atty., Edward E. McNally, Dist. Atty., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Michael B. Looney was convicted of first-degree assault, AS 11.41.200(a)(1), and fourth-degree assault, AS 11.41.230(a)(1), following a jury trial in the Anchorage superior court. For the crime of first-degree assault, Superior Court Judge Mark C. Rowland sentenced Looney to 20 years' imprisonment with 5 years suspended. For the crime of fourth-degree assault, Judge Rowland sentenced Looney to a concurrent term of 1 year's imprisonment.

Looney appeals his first-degree assault sentence, contending it is excessive. We affirm.

On the evening of November 24, 1989, Richard Hunter was driving in south Anchorage when he saw a disabled vehicle on the side of the road. The driver of the disabled vehicle was Michael Looney. Even though Hunter did not know Looney, Hunter stopped his van and helped Looney push the vehicle to the nearby residence of Looney's mother.

When they arrived, Looney invited Hunter into the house to meet his mother and her boyfriend. Later in the evening, Looney's sister, April, arrived. Looney, Hunter, and April Looney decided to go drinking and dancing.

Looney told his companions that before they could go drinking he needed to visit the home of Leanne Reed, his common-law wife, to retrieve identification so that he would be admitted to the bars. (Looney was 24 years old.) Looney called Reed and asked if he could come to her house. Reed told him to stay away. However, an hour later, Looney rang Reed's doorbell and asked her to let him in.

Looney knew that his visit to Reed's house was illegal. Two weeks before (on November 9), Leanne Reed had obtained a domestic violence writ against Looney after he punched her in the eye, nose, and arm.

Reed told Looney to leave. Looney left her door, and Reed went to bed. However, a short time later, Reed heard the sound of breaking glass; Looney had broken into Reed's house through a front window.

Reed telephoned her father for assistance and then went to confront Looney. Before help arrived, Looney attacked Reed, beating her with his fists, then knocking her down and kicking her. Reed suffered bruises to her head and arm, a cut lip, and a broken tooth.

During the attack, Looney asked Reed if she had called the police. Reed said she had. Looney then forced Reed to call 911 and directed her to tell the emergency operator that everything was all right. Reed dialed the phone but remained silent when the operator answered. Looney became more enraged and yanked the telephone out of the wall.

Meanwhile, April Looney (who had been waiting in Hunter's van) entered Reed's house and tried to get her brother to leave. Looney chased his sister around the house but eventually calmed down and left the house.

Looney, Hunter, and April Looney drove to a restaurant, but they were refused entry because all three of them had been drinking and because Looney's hand was bleeding from a cut he had sustained when he broke through Reed's window. April Looney elected to stay at the restaurant and call a friend to pick her up and take her home. Looney and Hunter headed for another bar.

Arriving at the bar, Looney was again refused entry because of his intoxication and because Looney could not produce proof of his age. Looney and Hunter were able to purchase liquor at a liquor store; they then went back to Looney's house. While they were drinking, Looney and Hunter began to discuss firearms. Looney took out three firearms: a .22 caliber rifle, a .30–'06 rifle, and a 9 mm semi-automatic pistol. Between 3:00 and 4:00 on the morning of November 25, the two men decided to drive south on the New Seward Highway and shoot these weapons.

Looney and Hunter first began shooting the .30–'06 rifle, but it jammed after several shots. They tried firing the .22 caliber rifle, but it jammed immediately. The two men spent the next hour drinking and firing shots from the 9 mm pistol.

Hunter went to the back of the van to urinate. When he returned, Looney was nowhere to be seen. Hunter walked around the van, calling Looney's name, but Looney kept out of sight and made no response. As Hunter returned to the driver's side of the van, he saw Looney walk toward him from the rear of the van. Looney was holding the 9 mm pistol. Without warning, Looney pointed the pistol at Hunter and fired.

This first shot struck Hunter near his hip; he crumpled to the ground. Looney hesitated a moment, and then, laughing, began shooting again at Hunter as he lay on the ground. Looney stopped only when he had exhausted the ammunition in the pistol.

Hunter, who had been hit several times, watched Looney go back inside the van. Correctly surmising that Looney was going back to find more ammunition and reload the handgun, Hunter crawled away from the van and rolled himself down the highway embankment to the Alaska Railroad tracks.

Looney first tried to drive the van away, but the vehicle became stuck in the snow. Looney then walked down the embankment to where Hunter lay. Pointing the 9 mm pistol at Hunter's head, Looney told him to surrender his money. After Hunter had given Looney his money (approximately $30 to $40), Looney raised the pistol and pointed it at Hunter's head. Hunter, pleading for mercy, raised his hands in front of his face. Looney fired. The bullet struck a finger of Hunter's left hand, the force of the blow pushing Hunter's hands against his head. Hunter collapsed and feigned death.

Looney climbed back up the embankment, entered Hunter's van, and drove away, northbound toward Anchorage. Heavily intoxicated, he apparently fell asleep while driving; the police found the van in a ditch, with Looney still behind the wheel. The police recovered the 9 mm pistol in the snow nearby. A round of ammunition was jammed in the pistol's action, indicating that Looney may have tried

to shoot Hunter one more time but was unable to.

Hunter was rescued by a pair of rock climbers who discovered him when they came to practice on the cliffs overlooking the Seward Highway. Hunter was in critical condition. He had been shot in his right thigh, his abdomen, his right knee, and the little finger of his left hand. He had two additional grazing wounds, one on his right leg and another on his left rib cage. Hunter was suffering from serious blood loss because the bullet in his right knee had severed a major artery. The bullet that entered his abdomen had struck his spine, paralyzing his right leg. Moreover, Hunter had lain exposed for two hours in twenty-degree weather. Six hours of surgery saved Hunter's life, but his right leg is permanently paralyzed.

For his attack on Richard Hunter, Looney was indicted for attempted murder and first-degree assault. For his attack on Leanne Reed, Looney was indicted for fourth-degree assault. At trial, Looney defended on a diminished capacity theory. The jury was unable to agree on a verdict on the attempted murder charge, but the jury convicted Looney of first-degree assault and fourth-degree assault. The State elected not to retry Looney on the attempted murder charge.

Looney was a first felony offender for presumptive sentencing purposes. Because he was convicted of first-degree assault under AS 11.41.200(a)(1) (recklessly causing serious physical injury by means of a dangerous instrument), Looney faced a presumptive term of 5 years' imprisonment for this class A felony. AS 11.41.200(b), and AS 12.55.125(c) as interpreted in *Pruett v. State*, 742 P.2d 257, 262–63 (Alaska App.1987).

Looney, who was 25 years old at the time of sentencing, had an extensive criminal history, both as a juvenile and as an adult, beginning when he was 12 years old. In February 1977, Looney committed burglary. In May 1977, he committed two different trespasses. One year later, in May 1978, Looney committed armed robbery; Looney and his brother obtained money from smaller boys by threatening them with a "wrist rocket" (a high-powered sling-shot) and with "numchucks".

In August 1978, Looney was adjudicated delinquent for harassment. In May 1980, he committed joyriding. And in February 1982, he committed forgery, theft, and joyriding. Following this last series of offenses, Looney was committed to a juvenile facility for up to 4 years. He was released from juvenile custody on May 2, 1983. Six months later, Looney commenced his adult criminal record.

In December 1983, Looney committed grand theft in Idaho. He was sentenced to an indeterminate term of imprisonment not to exceed five years. After Looney was released on probation in May 1984, he came to Alaska.

In July 1985, Looney committed the crimes of theft, vehicle tampering, and providing false information to the police. He received a suspended imposition of sentence on each count.

The next year, Looney assaulted his wife, Tammy Looney; he also was convicted of resisting an officer and providing false information to the police (giving a false name when arrested). Looney received a total sentence of 150 days in jail with 137 suspended for these three crimes and was ordered to pay a $250 fine. As conditions of probation, he was prohibited from having contact with his wife and was also ordered to undergo male awareness counseling and to submit to alcohol screening. Looney's probation was later revoked because he had contact with his wife, he failed to go to counseling, he failed to submit to alcohol screening, and he failed to pay the fine.

In July 1987, Looney was convicted of shoplifting and of driving while his license was suspended. He was sentenced to 30 days with 28 suspended for the shoplifting, and to 10 days for driving with a suspended license.

Looney returned to California. In August 1988, Looney was convicted of the California offense of inflicting injury on a spouse (Leanne Reed) and of the additional

offense of providing false information to the police officer investigating the assault. One month later (September 1988), Looney was again convicted of inflicting injury on a spouse. Looney received suspended impositions of sentence for these crimes and was ordered to pay a fine and to undergo counseling. Looney's probation was revoked because he failed to pay the fine and failed to undergo counseling.

In July 1989, Looney was charged with three crimes: inflicting injury on a spouse, inflicting injury with intent to terrorize, and obstructing or resisting a police officer. The first two charges were dismissed when Looney pleaded guilty to resisting the officer. He was again given a suspended imposition of sentence but, as a condition of probation, was ordered to spend 40 days in jail.

Looney returned to Alaska, where the following month (August 1989) he committed the crime of driving while his license was suspended. He received 60 days in jail with 50 suspended.

Finally, on November 25, 1989, Looney committed the offenses in the present case. In addition to the first-degree and fourth-degree assaults for which he was indicted and convicted, the record shows that Looney committed several other offenses that day: driving while intoxicated, driving with a suspended license, first-degree burglary (breaking into Leanne Reed's house), and first-degree robbery (taking money from Richard Hunter at gunpoint).

Upon this record, Judge Rowland found that the State had proved three aggravating factors: Looney's criminal history included aggravated or repeated instances of assaultive behavior, AS 12.55.155(c)(8); Looney's criminal history included a juvenile delinquency adjudication for conduct (forgery) that would have been a felony if committed by an adult, AS 12.55.155(c)(19); and Looney's conduct in the present case was among the most serious included in the definition of first-degree assault, AS 12.55.155(c)(10). Looney did not assert the existence of any mitigating factors.

In Looney's interview with the pre-sentence investigator, Looney acknowledged that he had had a substantial problem with both alcohol and drugs since he was 19 years old. The pre-sentence investigator concluded that, while Looney could be amiable enough when sober, Looney's inability to refrain from alcohol and drug abuse, and his violent behavior when intoxicated, had been a major factor in causing his lengthy involvement with the justice system. Moreover, Looney had consistently refused to take advantage of rehabilitative counseling and treatment that was made available to him.

Based on the facts of the present case, Looney's criminal history, and Looney's persistent failure to come to grips with his alcohol and drug abuse, Judge Rowland concluded that Looney was a worst offender. He found that Looney was extremely dangerous when he was drinking or using drugs, and he concluded that Looney's inability to cope with these problems made it likely that Looney would continue his assaultive behavior unless he was incarcerated.

Judge Rowland declared that he believed Looney's isolation in prison was required for the protection of the public and that isolation of the offender was the most important sentencing criterion in Looney's case. *State v. Chaney*, 477 P.2d 441 (Alaska 1970). As noted above, Judge Rowland sentenced Looney to 20 years' imprisonment with 5 years suspended for the first-degree assault on Richard Hunter.

■ Arguing that his sentence for first-degree assault is too severe, Looney first contends that his sentence violates the rule announced in *Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981), that first felony offenders should normally serve a lesser term of imprisonment than the presumptive term specified for second felony offenders. However, Judge Rowland found three aggravating factors, factors which Judge Rowland relied on when he sentenced Looney to a term of imprisonment exceeding the 10–year presumptive term specified in AS 12.55.125(c)(3) for second felony offenders convicted of a class A felony. *Neakok v. State*, 653 P.2d 658, 662 (Alaska App.1982).

Looney argues that these aggravating factors did not justify a major adjustment of the presumptive term. Looney asserts that his lengthy history of assaultive behavior is not particularly relevant to his first-degree assault conviction because most of his assaults were directed toward the women he lived with. The major exception is Looney's juvenile adjudication for armed robbery, but Looney contends that he should not be penalized for conduct that occurred when he was 12 years old. With regard to the forgery committed while he was a juvenile—Judge Rowland's basis for finding aggravator (19)—Looney likewise argues that this theft-related offense bears little relevance to the first-degree assault in this case.

■ When a sentencing judge finds that aggravating or mitigating factors have been proved, the judge's next duty is to decide how much to adjust the presumptive term on account of these factors. For this purpose, the factors are weighed in light of the *Chaney* sentencing criteria. *Juneby v. State*, 641 P.2d 823, 833, 838 (Alaska App. 1982), *as modified on rehearing*, 665 P.2d 30, 31–32 (Alaska App.1983).

■ It is true that most of Looney's past criminal assaults have been committed against the women in his life rather than against strangers. This, however, does not mean they have minimal importance. To the contrary: the Alaska legislature views domestic assault as an aggravated form of assault. AS 12.55.155(c)(18)(A). Moreover, as a condition of his sentences for this long string of assaults, Looney was repeatedly ordered to participate in anger counseling and alcohol rehabilitation programs. Looney's probation was repeatedly revoked because he refused to participate in these rehabilitative programs. Looney's persistent refusal to avail himself of rehabilitative opportunities is directly relevant to the *Chaney* criteria of potential for rehabilitation, need for isolation, and deterrence.

■ Likewise, even though the forgery Looney committed as a juvenile is a much different crime from the first-degree assault Looney committed in this case, Looney's adjudication for forgery led to his spending over a year in a juvenile institution. Within six months after his release, Looney committed his first adult criminal offense. This history is again relevant when judging Looney's potential for rehabilitation, the need for his isolation, and the amount of punishment necessary to deter him from further crimes.

Finally, Judge Rowland found that Looney's conduct was among the most serious within the definition of first-degree assault. Judge Rowland based this decision on three factors: first, Looney's attack on Hunter was completely unprovoked and lacked any apparent motive; second, Looney demonstrated cruelty by laughing at Hunter as he shot him repeatedly, and then by shooting Hunter a final time while Hunter begged for mercy; and third, Looney's conduct approximated the more serious offense of attempted murder.

■ It is true, as Looney contends, that a sentencing judge must exercise caution when adjusting a presumptive term based on aggravating or mitigating factors. *Juneby*, 665 P.2d at 30. The amount of adjustment should hinge on the degree to which the factors proved in a particular case, evaluated in light of the *Chaney* criteria, distinguish the defendant or the defendant's conduct from the typical offender and offense envisioned by the legislature when it established the presumptive terms.

■ Here, however, Judge Rowland concluded that Looney was a worst offender. Such a characterization, if justified by either the facts of Looney's present offense or his criminal history, *Moore v. State*, 597 P.2d 975 (Alaska 1979), would support imposition of even the maximum sentence (here, 20 years' imprisonment). *Jacinth v. State*, 593 P.2d 263 (Alaska 1979); *Tommy v. State*, 551 P.2d 179 (Alaska 1976); *Galaktionoff v. State*, 486 P.2d 919 (Alaska 1971).

We conclude that the record in Looney's case supports Judge Rowland's sentence. Without provocation or other apparent motive, Looney stalked Hunter, shot him repeatedly, robbed him as he lay wounded,

and then fired another shot at his head. Having done this, Looney left Hunter lying in a place where he was unlikely to be found before he either bled or froze to death. As a result of this assault, Hunter's right leg is permanently paralyzed.

At the age of 25, Looney had been in trouble with the law, as a juvenile and later as an adult, for half his life. He had several assault convictions as well as several convictions involving dishonesty. He had spent over a year in a juvenile institution, but this had not deterred him from further criminal activity. He had serious alcohol and drug problems which he refused to address. Even when sentencing courts had ordered him to undergo anger counseling and alcohol treatment, Looney consistently refused to participate in these rehabilitative efforts.

In *Pruett v. State*, 742 P.2d 257, 264 (Alaska App.1987), based on an extensive review of past assault sentences, this court concluded that "[s]entences of 10 years or more [to serve] ... have generally been based on isolation as a goal of sentencing and have been reserved for those with a proven record of recidivism or those whose conduct involved premeditated attempts to kill or seriously injure." *Pruett* phrases these two criteria in the disjunctive, but Looney's case satisfies both of them. Looney purposefully tried to kill or seriously injure an unarmed man, and his 12 years of continuing criminal offenses demonstrate his recidivism.

*See also State v. Wentz*, 805 P.2d 962 (Alaska 1991), rejecting the notion that these two criteria are the only ones that could justify a sentence of more than 10 years to serve.

While Looney's sentence is severe, it is not out of line with sentences previously upheld in aggravated assault cases. For example, in *Wentz* the supreme court upheld a sentence of 15 years with 3 suspended (12 years to serve) for a defendant who beat his wife, causing severe brain damage. A first felony offender, Wentz nevertheless had twelve misdemeanor convictions (three of them for assault) and long-standing problems with alcohol and anger control.

*Id.* at 963. Looney's conduct and past history are similar to those in *Wentz* in many respects, but Looney's crime is arguably more serious, since Looney assaulted Hunter with a firearm in a manner that was calculated, and substantially certain, to cause death or serious physical injury.

In *Kagak v. State*, 624 P.2d 818 (Alaska 1981), the supreme court upheld a sentence of 15 years to serve for shooting with intent to wound. Kagak, while on a drinking binge, brandished a shotgun and then fired it into an onlooker's shoulder at point-blank range. Kagak had one prior conviction, for armed robbery.

Several times, the supreme court has upheld sentences in the 15- to 20-year range for armed assaults which resulted in no injury. In *Cooper v. State*, 595 P.2d 648 (Alaska 1979), the court upheld a composite sentence of 15 years to serve for a defendant convicted of firing shots at three police officers, none of whom was hit. Cooper, a chronic alcoholic, had three prior felonies, but these were all non-violent offenses: passing a forged check, burglary of a dwelling, and sale of marijuana. *Id.* at 650.

In *Fox v. State*, 569 P.2d 1335 (Alaska 1977), the supreme court upheld a composite sentence of 20 years to serve for armed robbery and assault with intent to kill. Fox tried to shoot a police officer who had come to arrest him for the robbery; luckily, the shot missed and the officer was unharmed. Fox had no prior criminal convictions, although he had been disciplined while in the military for drug possession, joyriding, and possession of an unregistered firearm. *Id.* at 1336.

In another instance, *Ferguson v. State*, 590 P.2d 43 (Alaska 1979), the supreme court upheld a composite sentence of 15 years to serve under similar circumstances. Ferguson and two companions entered a bar and robbed a bartender and four patrons at gunpoint. A short time later, two officers of the State Troopers spotted the trio driving down the highway and gave pursuit in their patrol cars. Ferguson rolled down a window of his car and fired two shotgun blasts, one at each of the

patrol cars; the pellets struck the officers' cars but did not wound the officers. Ferguson, at age 18, had no adult convictions but he did have juvenile adjudications for shoplifting and burglary. He was also a problem drinker.

As the Supreme Court reiterated in *Wentz*, 805 P.2d at 965:

[A]nalytically, the clearly mistaken test [adopted in *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974)] implies a permissible range of reasonable sentences which a reviewing court, after an independent review of the record, will not modify. This "range of reasonableness" ... should be determined ... by an examination of the particular facts of the individual case in light of the total range of sentences authorized by the legislature for the particular offense.

(Emphasis deleted from the original)

Generally, one cannot expect sentencing judges to find appellate sentencing decisions that deal with facts identical to the cases before them. Moreover, one can often argue that the criminal conduct in a past case or the defendant's criminal history in a past case is either more or less egregious than the present defendant's conduct or history. However, the decisions cited above show that the sentence Looney received—20 years' imprisonment with 5 years suspended—is within the range of sentences upheld in comparable assault cases. Looney's sentence is therefore not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

■ Looney argues that, whether his sentence is facially reasonable or not, Judge Rowland should not have imposed such a lengthy sentence without first ordering Looney to undergo a psychological evaluation. *See State v. Bumpus*, 820 P.2d 298, 304–05 (Alaska 1991), and *DeGross v. State*, 768 P.2d 134, 141 (Alaska App.1989). However, Looney never complained of the lack of a psychological evaluation during the sentencing proceedings in superior court.

Looney's failure to demand a psychological evaluation may well have been tactical. Looney's privilege against self-incrimination gave him the right to refuse to participate in a court-ordered psychological evaluation. *R.H. v. State*, 777 P.2d 204 (Alaska App.1989). Rather than have Looney submit to an evaluation that might provide the prosecution with evidence to use against him, or rather than prompt the superior court to order an evaluation and then have Looney explicitly invoke his privilege against self-incrimination, Looney's attorney may have felt it more advantageous to proceed with sentencing in the absence of a psychological evaluation.

If Looney believes that a psychological evaluation would be helpful to him, he may seek one in conjunction with a timely motion to reduce his sentence under Alaska Criminal Rule 35(a).

The sentencing decision of the superior court is AFFIRMED.